their nonaction under this resolution during the time that they supposed it was within their power. Their inaction, which was the consequence of their resolution, was thoroughly understood. They did not hold themselves aloof, as resistants, behind that resolution, but frankly explained their position, without receiving any censure from the other city authorities, and sought the co-operation of such officials to remove the obstacles in the way of further work. After the rescission of the resolve there is no criticism possible of their course. The other acts of alleged misconduct in the matter·of the special contracts are spelled out by applying to a course of mere formal assessments, in cases where as matter of fact, as was well known at the time, the owner of the property made his own improvements at his own expense, the tests which were applicable to actual assessments, as if the city were to defray the expenses in the first instance. If the commissioners had done the things the nondoing of which is now charged against them, they would have done flagrant injustice. Whatever they did or did not seems to have had the approval, or at least the acquiescence, of the other city authorities at the time. These matters were not done in the dark. Their conduct, even under the light of the severe criticism which naturally would select the supposed errors therein and naught else, did not deserve censure, much less removal from office.

The determination should be annulled in every respect, and the relators reinstated, with $50 costs and disbursements. All concur.

---

## In re DROEGE, City Magistrate.

(Supreme Court, Appellate Division, First Department. January 8, 1909.)

1. PRISONS (§ 14*)—DISCHARGE OF PRISONERS—POWERS OF MAGISTRATE.

Prisoners convicted and committed to the workhouse by a city magistrate, as provided by New York City Charter (Laws 1901, p. 294, c. 466) § 707, cannot be discharged by the magistrate except upon the certificate of the commissioner of correction, as provided by section 710, p. 298.

[Ed. Note.—For other cases, see Prisons, Cent. Dig. § 25; Dec. Dig. § 14.*]

2. JUDGES (§ 11*)—REMOVAL—"CAUSE."

Improper judicial determinations or mistakes based merely upon errors of judgment, and without corrupt or improper motives, do not constitute "cause" for which a city magistrate may be removed from office by the Supreme Court under the power conferred by Const. art. 6, § 17, and New York Charter (Laws 1901, p. 599, c. 466) § 1401a, but he may be removed for such conduct as satisfies the court that he has been actuated by unworthy or illegal motives in the exercise of his judicial duties, or if he has committed such acts as to justify the inference that either from gross ignorance or from a preverted character, or from a lack of judicial qualities, he has so administered the power conferred upon him as to show that he should not be continued in office.

[Ed. Note.—For other cases, see Judges, Cent. Dig. § 43; Dec. Dig. § 11.*

For other definitions, see Words and Phrases, vol. 2, pp. 1009–1012; vol. 8, pp. 7597, 7598.]

3. JUDGES (§ 11*)—REMOVAL—"CAUSE."

Where it appeared that a magistrate's discharge of a prisoner committed to the workhouse was granted in violation of the plain provisions

---

of the statute and was the result of a solicitation of his associate, occupying offices with him, who had received a fee for his interference, and that he had granted similar discharges without examination or investigation, and had paid $250 to suppress the publication of a story in relation to his official conduct, it was sufficient to justify the conclusion that his conduct had been such that the orderly administration of justice required his removal from office by the Supreme Court under the authority conferred by Const. art. 6, § 17, and New York City Charter (Laws 1901, p. 599, c. 466) § 1401a, relating to removal of judicial officers for cause.

[Ed. Note.—For other cases, see Judges, Cent. Dig. § 43; Dec. Dig. § 11.*]

Application for the removal of O. H. Droege, a city magistrate. Granted.

Argued before INGRAHAM, McLAUGHLIN, LAUGHLIN, HOUGHTON, and SCOTT, JJ.

Wallace MacFarlane and Howard Taylor, for petitioner.
John B. Stanchfield, for respondent.

INGRAHAM, J. The Association of the Bar of the City of New York has presented to this court a petition alleging that the respondent, a city magistrate of the city of New York, was guilty of such conduct as required his removal from office. A copy of this petition was served upon the respondent, who submitted his answer. The respondent, by his answer, does not directly put in issue any of the allegations of fact in the petition. He admits and alleges that he was appointed a city magistrate on the 18th day of July, 1907; that on January 6, 1908, while holding the magistrate's court in the Second district, he duly convicted one Louise Durand of disorderly conduct tending to a breach of the peace, and that, in pursuance of section 707 of the charter of the city of New York (chapter 466, p. 294, of the Laws of 1901), he committed her to the workhouse for a term of six months, or until the Commissioner of Correction, pursuant to chapter 701 of the charter, should order her discharge, and that the conviction and commitment of the said Louise Durand was after a trial upon which the accused was represented by counsel, and that in pursuance of such conviction the said Louise Durand was taken to the workhouse and commenced her term of commitment; that the day after the commitment a Mr. Rosenbach, a partner of the accused's counsel at the trial, went to one Isaac B. Schavrien, who theretofore had had no connection with the case, but who had been a personal friend of the respondent and who had occupied offices with him before he became a city magistrate; that the respondent talked with Schavrien and Rosenbach over the telephone; that said Schavrien received from Rosenbach a fee of $75 for his interposition in the case, but that the respondent was ignorant of that fact at the time the said conversation was had and until some time thereafter; that immediately after these conversations the respondent signed an order discharging the said Louise Durand, which he delivered to the clerk of the attorney for the convict, who had presented it.

The respondent denies that he executed this order solely as the result of the said telephonic communication, but alleges that there had

come a question in his mind as to the justice of his decision; that on the morning of the 7th of January these facts had been called to his attention in the conversation over the telephone, and that, when the respondent on that morning was brought to a realization that there was grave doubt as to the propriety of the conviction, he concluded that since the defendant had paid a higher penalty for the offense than was usually imposed by the other magistrates, where guilt was clear, she had paid a sufficient penalty for her misconduct, even upon the assumption of guilt, and that, in view of the doubt as to her guilt, the ends of justice would best be met by causing her forthwith to be released upon probation, and accordingly he issued the said order to that effect; that he issued this order without making any further investigation in the matter. The answer then alleges that there is a certain custom among the city magistrates in relation to the discharge upon probation of persons convicted of similar offenses, but admits that after he issued the probation order he did not inform the probation officer of the discharge, nor did he make a record of the same in such a way that the probation officer would know of it, alleging that the failure to make such a record and to notify the probation officer of the discharge was the result of pure inadvertence; alleges that the said release was proper and lawful, and that under the custom the person discharged on probation would not have been required to report had the record been made and the probation officer been notified; and that this act was not done pursuant to the telephone request from his personal friend, but was done as a judicial act, in the exercise of his best judgment and discretion. The court then appointed a hearing upon this petition and answer, which took place in open court, and the respondent produced such witnesses as he desired. The respondent testified to the facts alleged in his answer as explaining and justifying the order that he had made in the Durand case. He testified that it was the prevailing custom among the magistrates to place upon probation people who had been committed to the workhouse, and that he believed that he had a right to place upon probation those he had so convicted of disorderly conduct and committed; that this Durand woman had been arrested on the charge of keeping a disorderly house; that the charge was changed to one of disorderly conduct; that she was represented by counsel, and that he convicted her and committed her to the workhouse for a period of six months; that he had no means of knowing whether this offense was the first offense or not, and that subsequent to the commitment he received information that she was a woman who had been a witness against the police at the Lexow investigation; that on the next morning, at his house, he received a message by telephone from Mr. Schavrien, who had occupied one of a suite of offices with him; that Schavrien told him that Mr. Rosenbach had called to see the respondent at the office in reference to this Durand case; that the Durand woman whom the respondent had convicted was not Durand, but a Mrs. Herman, who had been famous during the Lexow investigation, and that he felt sure that the police had put up a job on her; that Rosenbach wanted to speak to the respondent, and that he could vouch for anything that Rosenbach could say; that Rosenbach then

had a conversation with the respondent over the telephone as to the guilt of the prisoner, and the respondent told Rosenbach that, if he would send up a discharge, the respondent would immediately discharge her; that shortly after he signed the discharge, and gave it to the messenger who presented it; that it was his duty to inform the probation officer, whose duty it was to make the proper entry in the records; that he did not inform the probation officer because he forgot all about it; that at the time he did not know that Schavrien had received any fee from the prisoner; that on the 15th of January one of the probation officers told the respondent that she had received no notification that this woman had been placed on probation, and the respondent told her that he had forgotten to have the entries made and information given to the probation officers; that on this same night (15th of January) the same probation officer told the respondent that a man named Lutz was about to write up some story about the probation work, or in connection with the court; that the next day the respondent asked the probation officer to inquire of a Mr. Alter, one of the lawyers connected with the magistrate's court, about Lutz, as to his character, and whether he knew anything about the story; that the next day Alter called on the respondent at his downtown office, which he then occupied with Schavrien; that Alter said he had seen Lutz, and that Lutz had said that the story was going to be a very scandalous story; that he did not learn from Alter the nature of the story—Lutz had refused to tell the details—but said that it was a story of such a scandalous nature that after it was produced the respondent would probably commit suicide; that the respondent then told Alter that there was nothing in his judicial conduct that he would care about, and Alter then told the respondent that all that Lutz wanted was to be paid for his trouble; that Alter said these people are all out for money, that they say that, if this story can be suppressed for a payment of a few hundred dollars, that would be the last the respondent would hear of it, and then Alter went away to have a further talk with the people who were getting up the story; that Alter again called on the respondent, and said the people would not publish the story if they would pay $10,000, whereupon the respondent told them to go ahead and publish the story; that the next morning Alter came to the respondent's office and told the respondent that the people who had been investigating the respondent had offered to sell the story for $250, and the respondent then gave to Alter $250 with the understanding that the story was to be bought; the witness then said that he had made other discharges in the same way; that he usually gave the discharge to one of the probation officers, but sometimes it was to a person interested in the case.

Upon cross-examination he testified that on the night of the 15th of January he had a conversation with a reporter from the New York World, who said that they were looking over the probation records of the court, but would not give the respondent anything in the nature of an assurance about the story; that the respondent was admitted to the bar here in 1896, and, on being asked as to what law gave to a magistrate power after commitment to discharge a prisoner on probation, the respondent stated that it was section 710 of the charter. The

witness further testified that as a rule he would turn over these charges to the probation officer and let him attend to the rest of it.

One of the probation officers testified that, as a rule, when an application was made to discharge on probation a prisoner after he had been committed to the workhouse by the magistrate, the probation officer investigated the case and tried to verify the statement of the person making the application, and the discharge would depend upon the report of the probation officer; but that it occasionally occurred that this was not done, and the prisoner would be discharged without such investigation; that the usual practice was to order the investigation first.

Schavrien, who first communicated with the magistrate in relation to this charge, testified as to his communication with the respondent and as to the respondent's communication with him; that two or three days after the discharge Rosenbach said that he had got a good fee in the matter and would give the witness a piece of it; that Rosenbach then gave the witness $75; that he had two other cases in which he had obtained a discharge from the magistrate, and that in these two cases he received a fee, and had also received a fee of $25 in another case.

After this hearing, and after the case had been submitted, there was presented by the Bar Association of the City of New York what may be called a supplemental petition also asking for the removal of the magistrate, upon additional facts. From that petition it appears that the petitioner had received from the corporation counsel of the city of New York a special report by the commissioners of accounts, appointed by the mayor of the city of New York, based upon an investigation by the said commissioners of the proceedings of the respondent, a copy of such report being annexed to the petition. From that report it appeared that the respondent had discharged from the workhouse, either absolutely or upon probation, prisoners committed to that institution after a conviction and sentence by the respondent. The respondent submitted an answer to that petition, and the case was referred to a referee, who had made his report, and the proceeding has been reheard upon the original testimony taken before the court and that taken before the referee. Upon the original hearing the respondent attempted to justify his action under section 707 of the charter of the city of New York. No mention was then made of section 398 of the consolidation act (chapter 410, p. 106, of the Laws of 1882), and it was not then claimed by the respondent that he knew of that section, or relied upon it in his judicial action which is now under review. While it is entirely clear that that section of the consolidation act was repealed by section 1608 of the charter of 1897 (chapter 368, p. 555, of the Laws of 1897, as amended by chapter 466, p. 651, of the Laws of 1901), it is quite evident that this claim now made, that the relator considered that he had power under the consolidation act to discharge prisoners convicted and sentenced by him under section 707, is an afterthought, and the provisions of the consolidation act, having been clearly repealed, will not be considered in determining this application. The referee reports that between September 23, 1907, and January 5, 1908, a period of a little over three months, the respondent, without

observing the formalities required by the provision of the charter, and in violation of its plain and mandatory provisions, discharged 16 persons who had been convicted and sentenced by him. In all these cases the referee has reported that these discharges were not authorized by the charter and that they were unlawful. There was evidence before the referee that it was the custom of the city magistrates to discharge persons thus convicted and sentenced in violation of the provisions of the charter, and there is annexed to his report a statement of the discharges made by certain of the city magistrates of the First and Second Divisions from January, 1907, to September, 1908, there being in the First Division, which includes the county of New York, 287, of which 165, considerably more than one-half, were by five magistrates, and the referee reports that:

"It is shown, therefore, strange as it may seem, that the practice of granting discharges on probation after commitment, and also of granting absolute discharges in less than 20 days after the commitment, had prevailed to a greater or less extent among practically all the magistrates for a considerable period prior to the respondent's appointment, and that it continued down to the date of the present proceeding. Considering the number of the magistrates involved and the high standing of many of them, there can, of course, be no question that the practice in question was adopted by them in entire good faith, and with the honest belief that in some way or other they were vested with the powers which they so assumed to exercise."

That, in view of that fact, the referee is of the opinion that the respondent can hardly be blamed for following their lead, and that granting the discharges, he, like others, believed that he had power to do so. But one of the other magistrates was called by the respondent as a witness. That was Mr. Charles H. Whitman, who was a city magistrate from January 1, 1903, until 1909, when he was appointed a justice of the Court of General Sessions. He testified that he had never discharged any prisoners who had been convicted and sentenced absolutely, but had occasion to discharge some prisoners on probation who had been committed by him to the workhouse; that during the four years he had been magistrate he had discharged six or eight prisoners convicted and sentenced; that it was his custom in cases of this kind which were brought to his attention to have a probation officer attached to the court make an investigation and report to him in writing, together with a statement from the physician at the workhouse and usually the magistrate's own physician; that, if it appeared that the prisoner's physical condition was such that the further incarceration was likely to result seriously, he would discharge the prisoner on probation; that the papers were given to the probation officer, and this probation officer reported to the magistrate; that before he made such discharge he invariably had such investigation made by one of the official probation officers, also by his own officer, and sometimes he, himself, made such investigation, going to the workhouse to examine the case; that he never granted any discharge without notifying the probation officer in whose custody the prisoner was committed. This magistrate, during four years of service, discharged nine persons to the custody of the probation officer after making the investigation and ascertaining facts which made the continued imprisonment improper. The respondent, in less than two months, discharged sixteen

persons without any investigation, without the slightest justification and in violation of the express provisions of the statute, and without notifying the probation officer in whose charge the prisoners were to remain, and acting apparently upon the most frivolous reasons upon the solicitation of private individuals, or suggestions made by persons not connected with the administration of justice. The very broad distinction between a magistrate who, under a mistaken idea of his power, but in the conscientious discharge of what he considered to be a duty devolving upon him, has exceeded his power, and an officer who continually acted without regard to the proper or orderly exercise of the power that he supposed he had, is here clearly presented. The referee, in his report, has expressed his opinion that under the charter the magistrate had no power to discharge a prisoner convicted and sentenced, except under the provision of section 711 of the charter. That section provides that the magistrate who signed the last warrant of commitment may, after the expiration of 20 days, direct the discharge of any person committed; but the section further provides:

"Nor shall such order be granted by any magistrate except upon the written certificate of the commissioner specifying the date of discharge named by him for the person so committed, and upon an affidavit setting forth facts which, in the opinion of said magistrate, shall justify such discharge."

By section 707 of the charter the court or magistrate before whom a person is convicted of disorderly conduct is required to impose upon a person so convicted one or the other of the penalties therein provided. The magistrate may commit the person convicted to the workhouse to be detained for the term of six months, impose a fine not exceeding $10, or require the person convicted to give sufficient surety for his good behavior. The section also provides that any court or magistrate may suspend sentence in the case of any person convicted, and may release such person upon probation, upon such terms and conditions and for such period of time, not exceeding six months, as the court or magistrate may deem best; that a person released on probation, in accordance with the provisions of the section, shall be placed under the charge and supervision of a probation officer, to be appointed as therein provided, and shall be furnished by the clerk of the court with a written statement of the terms and conditions of his release.

It is made the duty of the probation officers to supervise the conduct of each person placed under their charge respectively, and to report any violation by any such person of the terms and conditions of his release. If two or more probation officers were assigned to any city magistrate's court, the court or magistrate is required to designate the officer under whose charge each person on probation shall be placed. It is quite clear that the magistrate had no power under this section to discharge a prisoner who had been convicted and committed to the workhouse. After conviction the magistrate could have suspended sentence and released the person upon probation, upon such terms and conditions and for such periods of time, not exceeding six months, as he might deem best. When thus released, the person that had been convicted of disorderly conduct was not to be discharged, but

was to be "placed under the charge and supervision of a probation officer," and furnished by the clerk of the court with the terms and conditions of his or her release. If the magistrate did not see fit to suspend sentence, he was then required either to impose a fine not exceeding $10, or require the convicted person to give security for good behavior, or commit the person so convicted to the workhouse to be detained for a period of six months. With the commitment to the workhouse the jurisdiction of the magistrate ceased, and the time of the prisoner's discharge was to be ascertained under sections 708 and 710 of the charter by the commissioner of correction, and with such a discharge the magistrate had nothing to do. When a prisoner who had been committed under section 710 of the charter, where the date of discharge named in the commitment was more than 20 days and less than 160 days, the magistrate could after 20 days direct the discharge of a prisoner so committed; but no such order could be granted by any magistrate in any case, except upon the written certificate of the commissioner stating the date of discharge named by him for the person so committed, and upon an affidavit setting forth facts which in the opinion of such magistrate justify such discharge, which certificate and affidavit must be filed with the complaint.

The orders discharging the prisoner were therefore unauthorized, and the commissioner of correction or the superintendent or other person having charge of the workhouse should not have obeyed them.

While, therefore, the order of the magistrate was absolutely without justification, violating the plain mandatory provisions of the statute, destroying a system which had been carefully devised to regulate the term of imprisonment of persons convicted and sentenced, depending upon their former record and whether they were not hardened offenders, the fact that most if not all the magistrates had exercised this power is to be considered in determining whether this respondent should be removed from office for violating this provision of the statute under which he acted when he convicted and sentenced those brought before him.

We will assume that, under the existing circumstances as disclosed in this proceeding, the mere fact that such discharges were granted would not justify the removal of a magistrate. The methods adopted by the respondent, the manner in which he exercised this power which he says he believes he had, in the light of his own explanation of his conduct, will now be considered. The facts in relation to the discharge of the Durand woman have been stated. She had been convicted and sentenced, and, as the result of a simple telephone message from his former associate in business and a conversation with a person representing himself to be the attorney for the convicted woman, he signed at his house a discharge placing the prisoner on probation, without notifying the probation officer, disregarding the plain provisions of the statute in relation to a discharge on probation, where it was apparent that the prisoner would be discharged before the probation officer had an opportunity to take charge of the prisoner, even if he had subsequently informed her, as he said he intended; yet, instead of waiting for any report from the commissioner, without requiring any affidavit as to the reason for the discharge, and without giving the

discharge to a probation officer, so that the officer could at least keep some record of the case and accomplish what the statute contemplated when authorizing a discharge on probation, the order was signed as a result of these telephonic communications upon a messenger bringing the order to the magistrate's house, without the slightest attempt to carry out the plain mandate of the statute by which such discharges were to be granted as educational or reformatory measures for the benefit of the unfortunates who had violated the law; and then his late business associate received a benefit from the fee that resulted to persons who had obtained the discharge. The same conception of the respondent of his duty in relation to the discharge of persons convicted is evidenced in the 16 cases which are covered by the second charge. Thus, in the first case mentioned in the referee's report, that of Sophie Wilson, she had been convicted and sentenced on September 23, 1907. On the following day the respondent signed an order: "On probation for balance of sentence." No probation officer was named, no record was made in the probation office, and no notice was given to any probation officer. The respondent's account of that is that he was in court the next day when a lawyer came to him and said the woman was pregnant, whereupon he signed the discharge. As the woman's confinement was not expected within a month or two, there would seem to have been no reason for haste, and, assuming that there was power, some investigation at least should have been made as to the truth of the statement. There was no affidavit, no certificate of the commissioner, and no attempt to comply with any of the provisions of the statute. In the third case reported by the referee, the prisoner was convicted on November 19, 1907. On December 7, 1907, she was discharged on probation by order of the respondent. This woman had been before committed three times to the workhouse within two years. Before this order was granted, the probation officer to whose charge she was committed testified that she had told the respondent that the prisoner was a prostitute, had been for some years, and that she was a very bad woman. The respondent admits that he knew she had been before convicted, and he discharged her without a report from the commissioner or affidavit of any kind, and in the face of this information from the probation officer. In relation to the ninth case reported on by the referee, the woman was a common prostitute, and was convicted and sentenced for six months in lieu of a bond of $2,000. The magistrate indorsed on the commitment: "This woman is a colored prostitute; please refer any application for bond to me;" but on January 11th the respondent discharged her. His explanation is that a young colored boy came to see him in court one day and claimed to be her brother; that afterwards some one came down claiming to be her mother, and upon her request he discharged the woman. Although his own indorsement shows that he knew she was a prostitute, yet, without any affidavit or report, she was discharged. The tenth and eleventh cases reported on by the referee are characteristic. Those two women were convicted and sentenced on January 3, 1908. On January 5th, two days after, they were both discharged in the custody of the probation officer, Miner, who, however, knew nothing about the discharge, she not being notified by the magistrate or by anybody else.

The respondent testifies, in relation to these women, that after the commitment and sentence a friend of his called at the court, and during the recess the magistrate and his friend went through the prison; that the friend became interested in these girls, as one of them was reading to the other a French book; that the magistrate's friend talked to the girls, and said that the work they were reading was a French classic, whereupon the respondent promptly discharged them. There was no question but that they were prostitutes, and no question but that they were properly convicted, and the law required that they should be imprisoned; but the French classic procured their discharge. The probation officer never received notice, and had no opportunity of discharging her duty in relation to them. In relation to the twelfth charge, a woman was convicted of prostitution in a tenement house on November 11, 1907. Four days afterwards the respondent discharged her, without affidavit or investigation of any kind. She was committed to the charge of a probation officer, who was not notified of the fact and knew nothing about it. The respondent's explanation was that some suggestion was made that the prisoner would leave the country, and that a ticket had been bought for her on one of the French steamers. There was no affidavit nor investigation. The other cases show the same disregard of all attempt to properly look after and fairly consider the cases over which the magistrate had jurisdiction. There is in none of those cases the slightest attempt to ascertain the character of the prisoners, whether or not they were old offenders or had been previously committed. After conviction and sentence they had been discharged upon the suggestion or solicitation of some one, without any real regard to the character of the prisoners or to the merits of any particular application. It is in connection with this disregard of the statute by the respondent, and as characterizing his fitness for his office, that the incident referred to in relation to his payment of $250 to suppress any examination into his record becomes material.

The magistrate knew that it was his judicial record that was being examined in connection with these charges. There was not the slightest foundation for the suspicion that the story about to be published which would involve him in disgrace was one that had already been published in relation to his experience in Baltimore, Md.; and the whole episode is so disgraceful and unbecoming a judicial officer that, taken in connection with his administration of the powers which he now says he supposed he had, it forces the conclusion that he is entirely unfit to continue to exercise the power of a city magistrate. To these magistrates are committed large discretionary powers, the proper and judicious exercise of which is essential to the well-being of a very large proportion of the people, who have little knowledge of judicial proceedings, and who have no one to look to for protection except the policemen and police magistrates. There are few public officers who have the opportunity of preventing or permitting so much oppression as these police magistrates, who are given large discretion to aid in the administration of justice; but the method before detailed has no relation to the administration of justice, as I understand it, and the facts before us have convinced the court that the

respondent is entirely unfit to be trusted with the power and au-. thority with which police magistrates are vested.

The authority of this court to remove a judicial officer is based upon section 17, art. 6, of the Constitution, which provides that justices of the peace and judges or justices of inferior courts not of record and their clerks may be removed for cause, after due notice and an opportunity of being heard, by such courts as are or may be prescribed by law. Section 132 of the Code of Criminal Procedure provides that justices of the peace, police justices, justices of justices' courts, and their clerks, are removable by the Justices of the Appellate Division of the Supreme Court. Section 1401a of the Charter of the City of New York provides that:

"A city magistrate or police clerk may be removed for cause, after due notice and an opportunity of being heard, by the Appellate Division of the Supreme Court within the division for which such city magistrate or police clerk was appointed."

Neither the Constitution nor the statute attempts to prescribe the "cause" which would justify the removal of justices of inferior courts not of record by the Appellate Division. The meaning of the phrase "for cause" has been considered in several cases in this state. In People ex rel. Munday v. Fire Commissioners, 72 N. Y. 445, the court had under consideration a provision of the city charter by which the fire commissioners were restrained from removing certain officers "until he has been informed of the cause of the proposed removal, and has had an opportunity of making an explanation." The court there said:

"This necessarily implies that the 'cause' is to be some dereliction or general neglect of duty, or incapacity to perform the duties, or some delinquency affecting his general character and his fitness for the office. The cause assigned should be personal to himself, and implying an unfitness for the place."

In Matter of Baker, 94 App. Div. 278, 87 N. Y. Supp. 1022, where there was presented to this court a charge against a city magistrate, we hold that, when the charge was based upon his judicial action, something more is necessary to justify removal than a statement that a magistrate made an error in applying legal principles in the decision of cases before him; that we were not called upon to express an opinion upon the correctness of the magistrate's rulings, and—

"if it was wrong, it was an error of judgment, and, in the absence of evidence that the magistrate did not fairly consider the testimony before him and determine the questions submitted as he thought the administration of justice required, there is no basis for a charge against the magistrate which would justify us in removing him."

In Matter of Tighe, 97 App. Div. 28, 89 N. Y. Supp. 719, the Appellate Division in the Second Department had before it a proceeding similar to that now under consideration. There the court said:

"To determine that question unfavorably to the magistrate, we must find something more than mere persistency in error of judgment. There must be evidence tending to show that the judicial acts complained of were corrupt, or that they were inspired by an intention on the magistrate's part to violate the law, or, at least, that there was such a persistent and apparently

114 N.Y.S.—25

intentional disregard of well-known legal rules as in itself amount to judicial misconduct".

—and quoted from Matter of Watson, decided by the former General Term in the Second Department, the remarks of Presiding Justice Brown, that:

"This is practically an impeachment of a judicial officer. We are here to try him upon a charge of official misconduct."

In Matter of Quigley (Sup.) 32 N. Y. Supp. 828, Brown, P. J., said, in referring to Matter of Watson, supra:

"That the court thought that the evidence against the accused should show that the judicial acts were corrupt, or that there was intentional violation of the laws governing a magistrate, or that there was a disregard of the legal rules that amounted to legal misconduct."

In Matter of Bolte, 97 App. Div. 551, 90 N. Y. Supp. 499, we had before us an application to remove a justice of the Municipal Court of the City of New York. After referring to the provisions authorizing this court to remove a justice of the Municipal Court, the court said:

"By virtue of these provisions of constitutional and statutory law, the respondent may be removed for any misconduct in office or willful neglect of duty. A judicial officer may not be removed for merely making an erroneous decision or ruling, but he may be removed for willfully making a wrong decision or an erroneous ruling, or for a reckless exercise of his judicial functions without regard to the rights of litigants, or for manifesting friendship or favoritism toward one party or his attorney to the prejudice of another, and to the destruction of his usefulness as a magistrate through the loss of public confidence in his fairness and integrity."

The opinion of Mr. Justice Laughlin in that case illustrates the principles which should be adopted in considering charges of this kind against a judicial officer. To justify the removal of a judicial officer, much more is required than erroneous rulings upon either cases decided before him or the extent of the powers conferred upon him by law. While the nature of his rulings may in certain cases indicate such a lack of professional knowledge or a lack of judicial temperament or of a character and appreciation of the duties of the office as will be sufficient cause for removal, the acts charged against the officer must be such as to justify the finding that his future retention of office is inconsistent with the fair and proper administration of justice which the law intrusts to him. It is quite impossible to formulate any distinct grounds upon which this power of removal should be exercised, as each case must depend upon the particular facts presented; but it is not error of judgment, it is not error in the decision of particular cases, it is not mistakes in the construction of statutes, or in the determination of the extent or limitation of his powers, standing alone, which would justify his removal, but such conduct as satisfies the court that the magistrate has been actuated by unworthy or illegal motives in the exercise of his judicial duties, or has committed such acts as to justify the inference that either from ignorance, or from a perverted character, or from a lack of judicial qualities, he has so administered the power conferred upon him as to show that he should not be continued in office. A single decision or judicial action, correct

or not, which is established to have been based upon improper motives, and not upon a desire to do justice·or to properly perform the duties of his office, will justify a removal, while many improper judicial determinations, or mistakes based merely upon errors of judgment, and without corrupt or improper motives, would not supply the "cause" contemplated by the Constitution and the statutes.

The respondent's explanation of his conduct but confirms the impression made by a consideration of his answer. The fact that the discharge of the Durand woman, which was a distinct violation of the statute, was the result of the solicitation of his associate, occupying offices with him which he was in the habit of occasionally visiting, who had received a fee for his interference, and that the same thing had happened in other cases before this particular magistrate, and the other instances in which he had granted similar discharges without examination or investigation, and the fact that he had paid $250 to suppress a story that was to be published in relation to his official conduct, is not consistent with the qualities necessary for the proper performance of his judicial duties.

One conclusion only can be drawn from this evidence taken together: That the respondent's conduct has been such that the orderly administration of justice and the welfare of the community require that he should no longer hold the position of city magistrate. The charges are therefore sustained, and he is removed from office. All concur.

<hr/>