In the Matter of the Investigation of HULON CAPSHAW, City Magistrate, Respondent.

First Department, January 26, 1940.

*Thomas D. Thacher*, for the application.

*William L. Ransom*, opposed.

MARTIN, P. J.   The judicial conduct of Hulon Capshaw, a city magistrate of the city of New York, was prominently brought to public notice as a result of the indictment and trial of James J. Hines for conspiring with others to contrive, propose and draw lotteries, particularly that form of gambling known and referred to as " policy " or the " numbers racket." It was alleged that part of the conspiracy was an agreement to influence or intimidate judicial officers and to dominate and control their decisions.

Shortly after the filing of the indictment the defendant Hines demanded the names and titles of judicial officers whom it was alleged he had influenced to refrain from doing their official duty. The bill of particulars ordered by the court and furnished by the district attorney in response to that demand, named Magistrate Capshaw as one of the city magistrates who was subservient to the conspirators.

The testimony offered on the Hines trial was to the effect that when the defendant Hines joined the conspiracy, he agreed to use his political influence to reduce, to the extent of his power, the danger of arrest to the operators of the numbers racket, their servants or employees, and, if an arrest should be made, he agreed to have the case disposed of favorably in the Magistrates' Court.

When that evidence became public, the present proceeding was initiated by the chief city magistrate of the city of New York. He submitted to this court copies of the stenographic minutes in the case of *People on the Complaint of Magnus* v. *Klein and Others* and in the case of *People on the Complaint of McCarthy* v. *Silverstein.* In each of these cases the defendants had been arrested and charged with a violation of section 974 of the Penal Law for possessing policy slips. The *Klein* case was heard by Magistrate Capshaw in the City Magistrates' Court, Twelfth District, borough of Manhattan, on December 9, 1932. The *Silverstein* case was heard in that court on May 6, 1933. The chief city magistrate also presented to this court a transcript of the testimony given by Magistrate Capshaw on the second trial of the case of *People* v. *Hines.* After the receipt of this testimony, this court, by order dated March 2, 1939, appointed Hon. Thomas D. Thacher as referee to conduct an investigation concerning any and all practices or official acts of Magistrate Capshaw, particularly in connection with the *Klein* and *Silverstein* cases.

The referee made an extended inquiry and upon its completion he rendered his report containing the following conclusions:

" Upon the evidence before me I am constrained to conclude:

" 1. That Magistrate Capshaw in discharging the defendants in the *Klein* case acted in violation of the duties imposed upon him by law and for considerations outside the evidence presented.

" 2. That Magistrate Capshaw in discharging the defendant in the *Silverstein* case acted in violation of the duties imposed upon him by law and for considerations outside the evidence presented.

" 3. That Magistrate Capshaw in testifying as a witness at the trial of the case of *People* v. *Hines* attempted to obstruct the administration of justice by deceiving and misleading the jury as to the evidence presented and the law which should have been applied in the *Klein* and in the *Silverstein* cases, and as to his real reasons for discharging the defendants in each of these cases.

" 4. That because of his conduct in the *Klein* and *Silverstein* cases and his conduct as a witness in the *Hines* case Magistrate Capshaw should be heard by this Honorable Court in a proceeding for his removal from his office of Magistrate of the City of New York upon an order to show cause why he should not be removed from said office for the causes specified in the three preceding paragraphs."

Thereupon this court ordered the accused magistrate to show cause why he should not be removed from office. In that proceeding additional testimony was adduced and the magistrate was heard in open session of this court in his own behalf.

The duty imposed by law on all city magistrates with respect to the conduct of examinations of defendants who have been arrested and charged with crime is set forth in sections 207 and 208 of the Code of Criminal Procedure. Section 207 provides that " if it appear, either that a crime has not been committed, or that there is no sufficient cause to believe the defendant guilty thereof, the magistrate must order the defendant to be discharged."

Section 208 provides: " If, however, it appear from the examination that a crime has been committed and that there is sufficient cause to believe the defendant guilty thereof, the magistrate must, in like manner, indorse on the depositions and statement, an order, signed by him, to the following effect; ' It appearing to me by the within depositions (and statement, if any) that the crime therein mentioned [or any other crime according to the fact, stating generally the nature thereof] has been committed, and that there is sufficient cause to believe the within named A.B. guilty thereof, I order that he be held to answer the same.' "

We have read and considered the testimony in the *Klein* and *Silverstein* cases and that of Magistrate Capshaw in the second Hines trial, the testimony given by him before Referee Thacher

and that given by him before this court in explanation of his conduct.

Magistrate Capshaw testified on the second Hines trial as a witness for the defendant. On direct examination by the attorney for the defendant the following testimony was read into the record in the form of a question: " Q. Now, Judge Capshaw, an individual by the name of George Weinberg, who testified at the last trial, but who committed suicide during this, and whose testimony at the last trial was read into this record, testified at the last trial, as I have said, read in here, as follows — he said first that he had been to the Keating Club with Mr. Hines — then I will read you this: ' Q. How long were you there?  A. We were there about half an hour.  Q. And then on the way out what happened? A. Hines stopped Capshaw.  Q. Where?  A. As he was starting to walk down the place he stopped him on the upper step and said to him, " Judge " —  Q. Were you there?  Were you present? A. I was about a foot or two away from him, about a foot.  Q. Did he introduce you to Capshaw?  A. He did not.  Q. At any time? A. No; later on, not then.  Q. Did you meet Capshaw subsequently?  A. I did.  Q. But not at that time?  A. That's right. Q. What did Hines say to Capshaw and what did Judge Capshaw say to him?  A. He said, " I have a policy case, a very important one.  Would you be able to handle it for me, a case coming up before you, and I would like to have you take care of it for me?" Q. Yes?  A. And Capshaw said, " Yes, who is it, or what is it?" and he said the name is George Klein and others.  Q. Yes?  A. " But it is very important that this case should be taken care of. I am very much interested in it," and Capshaw said to him, " I haven't failed you yet, I will take care of it."  Q. Is that all that was said?  A. That is all that was said.'  Now, Judge Capshaw, I ask you, did that take place?  A. It did not."

The *Klein* case involved fifteen defendants who were arrested in an apartment at 500 West One Hundred and Forty-fourth street, New York city, on November 22, 1932, charged with a violation of section 974 of the Penal Law in that they had in their possession certain policy slips.  All of the defendants were arraigned for hearing before Magistrate Capshaw in the Magistrates' Court, Twelfth District, Borough of Manhattan, on December 9, 1932. The three police officers who entered the apartment and participated in making the arrests testified before Magistrate Capshaw.  Under the statutes the only questions for the magistrate to determine were (1) was there a violation of section 974 of the Penal Law, and (2) had sufficient been shown to cause him to believe that the defendants arraigned before him were guilty and to justify holding them to answer the charge.

One of the arresting officers, Patrolman James Canavan, testified as follows:

" Q. You were both in civilian dress at the time?   A. Yes.   We then announced ourselves as police officers.   We walked inside and the defendant Klein grabbed me by the coat.   He said, ' Where do you come from, a division? '   I said, ' No, sir, from downtown.'   He said, ' Are you going to make a pinch? '   I said, ' Yes.'   He said, ' Can't we do something about this? '   I said, ' About what? '   He said, ' You have one of the biggest banks in Harlem.'

" I then proceeded inside the room.   I seen these defendants.   I saw seven adding machines.   I seen about 100 policy slips.   We then started to take the names and question the defendants."

The record further discloses that seven of the defendants were standing at adding machines and alongside of each machine was a little tray holding policy slips.   The arresting officer took the name of the operator of the machine and placed in a separate marked envelope the slips found alongside the operator.   Other defendants were seated at a long table and one of the arresting officers testified he saw long sheets of paper on the table used for tabulating and a number of policy slips.

Police Officer Canavan also testified that one of the defendants, Tessie Ware, stated that the defendants Blum and Klein were the bosses.   At the time she made this statement she was about four feet from Klein and Blum.   This same officer also testified that later the defendant Klein approached another officer in the presence of the witness and said, " Is there any chance to look at those sheets?   We have to know how much we have to pay out on the hit numbers."

The major portion of the policy slips found in the apartment were contained in three locked pouches.   Police Officer Canavan testified that two of the pouches had been cut open and before the third pouch was cut the defendant Klein said: " Don't cut that strip.   Here is a key to the lock."

Police Officer Magnus, the complainant against Klein and the other defendants, testified as follows: " I questioned each of the defendants how long they are working there and they all answered different times.   Q. They all answered what?   A. The length of time they worked there.   I asked the defendant George Klein what he was doing there.   He said he was — he came there to fix the machines.   I also asked the defendant Blum.   He answered the same way.   I asked him ' Where are the machines you fixed? '   They would not answer.   I said, ' Where are the tools that you had to fix these machines with? '   They would not answer.   I asked the other 13 defendants if they saw the defendants Klein and Blum fix any machines there, and they would not answer."

Police Sergeant Thomas W. Gray testified: " A. * * * As I looked around I seen that girl then — By the Court: Q. Who is that? A. This girl here (pointing). One of the defendants: Jean Valdez. A. (Continuing) I found her in a clothes closet. She had a lot of clothes wrapped around her. I asked her what she was doing there. She said, ' I thought I would get away with it.' "

The fact that there were fifteen persons employed in this place, that there were seven adding machines, more than two hundred thousand policy slips, tabulating sheets, stamp pads, date stamps and other paraphernalia required to operate a large gambling establishment of this kind, and that the defendant Klein himself characterized the enterprise as " one of the biggest banks in Harlem," appears to have made no impression on Magistrate Capshaw. He said he was of the opinion that somebody was guilty but he did not know on whom to place the guilt. He then discharged all the defendants.

There was positive proof that Klein had possession of the slips. One of the defendants stated to the officers that Klein was one of the bosses. Klein, as well as all the other defendants, had keys to the apartment. In addition, he handed the keys to one of the pouches containing policy slips to the police officer with the request that the pouch should not be cut open. Furthermore, we have pointed out that the defendant Klein told Officer Magnus that he was there to fix the machines but refused to answer when asked for his tools. This testimony by the complaining officer was corroborated by Officer Canavan who was present and heard the conversation. With reference to the defendant Klein and the defendants at the adding machines the testimony was more than sufficient to justify holding these defendants. The testimony, so far as the remaining defendants was concerned, was not so forceful, but when it is recalled that this was a preliminary hearing there certainly was sufficient proof to warrant holding all the defendants for trial.

In the light of the clear and convincing testimony adduced against the defendants, and particularly the defendant Klein, we are unable to perceive how the magistrate could have decided that the crime specified in the complaint had not been committed, or, if it had been committed, that sufficient evidence had not been presented to cause him to believe that the defendants were guilty thereof and should be held to answer for the same.

When Magistrate Capshaw was testifying as a witness for the defendant in the *Hines* case the attorney for the defendant interrogated him with reference to the case of *People* v. *Silverstein* as follows: " Q. A certain man by the name of Dixie Davis has testified here in this case that he had a conversation with Mr. Hines,

that Mr. Hines had told him that Hines had spoken to you about the *Silverstein* case, and that you said to him it will be O. K. Did he ever say that to you or did you ever say that to him; yes or no? A. No, sir."

In the *Silverstein* case the defendant was arrested on May 5, 1933, charged with possession of policy slips. He was arraigned in the Magistrates' Court, Twelfth District, Borough of Manhattan, before Magistrate Capshaw on May 6, 1933. The record disclosed that the arresting officers had received information that policy slips would be picked up at 419 West One Hundred and Forty-eighth street and they parked their car where they could view the premises. After they .had been waiting ten or fifteen minutes the defendant drove up to the house in a fast automobile. A colored man immediately ran down the steps of the house and handed the defendant a package wrapped in blue- paper. The defendant drove off in his automobile at a high rate of speed and turned north at Convent avenue. Followed by the officers, the defendant proceeded up Convent avenue to One Hundred and Fiftieth street, turned west on that street to Amsterdam avenue and then north on Amsterdam avenue to One Hundred and Fifty-first street. There both cars were stopped by a traffic light with the officers' car separated from the defendant's car by one or two automobiles and blocked on the west by a surface car. One of the officers got out of the police car and ran to the defendant's car, but as he was about to place his hand on the door of the defendant's car the light changed and defendant started off again.

Patrolman McCarthy, who was driving the police car, testified that he followed the defendant's car north on Amsterdam avenue to One Hundred and Fifty-third street, where the defendant made a very sharp turn. His testimony with respect to subsequent events is as follows: " As he turned the corner of 153rd Street he threw this package out and continued on about 35 or 40 feet and the car stopped and I pulled alongside of him. I asked the defendant why he threw the bundle out. I held him there until my partner came around the corner. I told my partner to pick up that package. He brought the package over to me. I asked him did he know what is in it; he said no. I continued the search of the car and found nothing. By the District Attorney: Q. Officer, did you investigate to find out what is inside that package? A. I did. Q. And what did you find inside the package? A. It contained policy slips."

The *officers* positively identified the color of the package found in the street to be the same as that which was handed to the defendant in front of the One Hundred and Forty-eighth street house.

It appears that out of a total of 304 questions addressed to the police officers the magistrate asked 197, defendant's counsel eighty and the district attorney twenty-seven. After evidencing an intention to discharge the defendant the magistrate addressed the following request to the defendant's attorney: " Would you mind having the defendant sworn and letting me ask him a question or two?" Thereupon the following questions, among others, were addressed to the defendant: " By the Court: * * * Q. Did you arrange to show the exhibit before this court, to have all these police chase you or anything? A. No, sir, I didn't know anything, I didn't even know what was happening. They stopped me, asked for my license, searched the car, I didn't know what it was all about. Q. Are these policy slips here yours? A. I don't know what a policy slip is, I never played one. Q. Did you have them in the car with you? A. I did not. Q. Did you throw them out in the street? A. I did not. Q. Are you sure of that? A. Absolutely. By the defendant's counsel: Q. Were you ever convicted of a crime? A. Never. By the Court: Q. You swear none of these were ever in your possession? A. Never, at no time. The Court: All right, defendant is discharged."

The defendant having voluntarily taken the stand, the magistrate asked no denial of the specific testimony of the police officers, and defendant's counsel failed to ask any question of the defendant except whether he had been previously convicted. The magistrate asked none of the questions which he criticized one of the officers for failing to ask out of court when later called as a witness in the *Hines* case. In the language of his own criticism, he did not ask the defendant anything about the fact that he had an appointment to get the policy slips, who the man was that brought them down the steps, what was going on in these premises from which the slips were brought, or when and under what circumstances he made the appointment to be there and receive the slips. In fact, he simply asked the defendant to repeat under oath the denials which the officers testified he had made on the street. The defendant's general denials without contradiction or explanation of the circumstances narrated by the officers were of no probative effect.

The magistrate's examination and discharge of the defendant, when considered in the light of the direct testimony of the People's witnesses and of the magistrate's cross-examination of them, disclose an attitude toward the case before him indicative of bias and unjudicial conduct which must have been influenced by considerations outside the record. His examination of the defendant was limited to matters tending to exonerate him and nothing was asked that might tend to establish his guilt.

The question must naturally suggest itself as to why the magistrate called the defendant to the stand to contradict the witnesses for the People, if it is true, as stated by the magistrate, that he suspected that the defendant was a policy banker arranging for his own arrest. It may be noted in passing that the defendant's testimony, as set forth above, corroborates that of the arresting officers to the effect that they stopped the car of the defendant, asked for his license and searched his car. It establishes the truth of the officers' testimony at least to that extent, and it does not contradict their testimony that he received the package of policy slips at 419 West One Hundred and Forty-eighth street. The magistrate surely did not expect the defendant to admit possession of the policy slips, particularly in view of the fact that the defendant had pleaded " Not Guilty " to the charge.

It is difficult to understand why the magistrate refused to believe that particular part of the police officers' testimony which referred to the policy slips, especially in view of the fact that the physical evidence, the package containing the policy slips, was produced in court and identified before it was offered in evidence. The testimony of the police officers having made out a clear case, the discharge would be incomprehensible in the absence of subsequent developments disclosed, to a great extent, by the direct and cross-examination of Magistrate Capshaw on the *Hines* trial, which was replete with damaging statements, contradictions and admissions.

The records in both the *Klein* and *Silverstein* cases lead to but one conclusion and that is that the magistrate had a preconceived determination to discharge the defendants. The court's questioning of the officers and the calling of the defendant Silverstein to the stand were merely attempts by the magistrate to develop a plausible explanation for his conduct. The studied attempt by the magistrate in both the *Klein* and the *Silverstein* cases to belittle and confuse the witnesses for the People was so marked and obvious as immediately to attract attention.

Police Officer Jones by his answers to questions by Magistrate Capshaw in the case of *People* v. *Silverstein* disclosed that he was aware of the unduly critical attitude of the magistrate. The officer's testimony evidencing that fact is very interesting: " Q. And was it necessary to chase this fellow all that distance and give him a chance to throw out anything he might have? A. It was. Q. Before you could get him stopped? A. It was. This defendant had a very fast car and we couldn't catch him. Q. Did you expect to happen just what did happen? A. No, sir, I did not. Q. Do you know this defendant? A. I never saw him before. Q. Do you know anybody that knows him? A. No, I do not.

Q. Did he know that you were a policeman, that you were chasing him? A. I don't think he did. Q. Did you ask him about that? A. No, sir, I did not. Q. Did he seem surprised or anything when you came up? A. I arrived there about four or five minutes after Patrolman McCarthy had this defendant on the street. Q. Did he look surprised or did he look like he knew about what was going to happen? A. No, he was just standing there. Q. Do you think he was tipped off that you fellows would give him a little chase and would have all this parade before the court? A. No, sir. Q. You don't think so? A. No, sir. Q. You don't think the same persons that tipped you off tipped him off too? A. No, sir. Q. That you would be there and give a little chase down the street? A. No, sir. Q. What makes you say that? A. If this defendant knew that we were going to be there he certainly would not have taken the package. Defendant's counsel: Now, I ask that that be stricken from the record. Q. Why do you say that — this is in the nature of an investigation, I want to find out what the truth is. Why do you say that? A. Well, this defendant, the way he came up there, took this package and then drove away at this high rate of speed. Q. Couldn't that be part of the scheme? A. It could have been part of the scheme but there is no scheme. Q. You feel sure of that? A. I am positive. Q. If there was any scheme that you don't know anything about? A. I don't think so. Q. I mean you either do or you don't? A. There was no scheme that I know anything about."

The attitude of the magistrate in two separate and distinct cases coming before him under the circumstances disclosed, where the overwhelming evidence warranted a holding, casts doubt upon his testimony that he was not influenced by matters outside the record.

The third charge — that in the *Hines* case Magistrate Capshaw attempted to obstruct and defeat the administration of justice — is also a grave charge.

The record in the *Hines* case contains many pages of contradictory and misleading evidence given by Magistrate Capshaw in his attempt to establish his innocence and to bring about the acquittal of Hines. He undertook to show that not only the testimony of Weinberg and Davis was false but also that the testimony of every witness (and there were at least five) in both the *Klein* and *Silverstein* cases was false. That effort ended in complete failure.

Magistrate Capshaw, having appeared as a witness in the *Hines* case, thereby submitted himself to both direct and cross-examination, and must accept the conclusions to be drawn from that evidence. To accomplish his purpose he misquoted evidence.

He even went to the extent of accusing of gross misconduct courageous police officers who had honestly performed their duty, which accusations were fully demonstrated to be false. It must be borne in mind that when Magistrate Capshaw offered himself as a witness in the *Hines* case he did so with full knowledge of the fact that several of the principals who were participants in the conspiracy had made complete confessions and had divulged the minute details of the numbers racket as operated by " Dutch " Schultz. Some of the criminals who had been aided in their unlawful activities followed the course that persons of such character frequently follow when caught. They turned State's evidence and implicated their so-called benefactors. They not only confessed their participation in the conspiracy but uncovered the whole sordid scheme. It is true, as pointed out, that one committed suicide and the other pleaded guilty, but those are not unusual results in criminal enterprises conducted on such a large scale.

In the *Hines* case these witnesses for the People gave testimony to the effect that after the arrest in the *Klein* case the power of Hines was invoked. Weinberg stated that Hines spoke to Magistrate Capshaw in his presence about it and the latter promised to take care of it.

Dixie Davis testified that, following the arrest of Silverstein, the power of Hines was again called into action, and the instructions were to proceed before Magistrate Capshaw and that it would be " O. K."

Magistrate Capshaw was called as a witness for the defense on the second trial of Hines to contradict that testimony and the inferences arising therefrom that he had been influenced by Hines in disposing of the *Klein* and *Silverstein* cases. Many pages of the specific testimony sought to be contradicted are before this court in the form of questions propounded to the magistrate. It is admitted that before testifying in the *Hines* case Magistrate Capshaw examined and analyzed the transcripts of the testimony in the two cases referred to and as a witness in the *Hines* case he discussed the testimony in those two cases and sought to explain his reasons for discharging the defendants.

In attempting to explain his decision in the *Klein* case he relied upon the alleged insufficiency of the testimony, and, to a broader extent, upon what he asserted to be the " incredibility " of the police officers. He testified that the testimony of the officers was " evasive or contradictory or clearly non-responsive;" " that these officers in material facts did not tell the same story; that they contradicted each other; that they were evasive in their answers." He also said that Police Officer Canavan answered in a " ridiculous manner."

In an effort to justify his dismissal of the charge against the defendant in the *Silverstein* case, Magistrate Capshaw characterized the testimony of the police officers in such terms as "absolutely ridiculous and absurd," "unreliable," "lackadaisical" and "evasive." He said that "this evidence miserably failed from what I thought, as a judge, that I could reasonably expect from these police officers." He criticized the conduct of the arresting officer, McCarthy, by stating that he "tried to crawl and cover himself," that he spoke "contemptuously" and "flippantly" to the court, that he "withheld vital testimony as to the identity of this package" and that he "was derelict in his duty."

The record discloses that there was nothing unusual about the testimony given by the police officers. Its truth was clearly established by the exhibits and the physical circumstances surrounding the arrests.

Magistrate Capshaw also attempted to justify his discharge of the defendant Silverstein by the statement that he did not believe the testimony of the two police officers.

At one place he testified that he doubted the testimony of a police officer in the *Silverstein* case because the officer testified "he threw this package out" rather than "I saw him throw this package out."

It is important to note that he appears to have had a doubt about the case from the beginning of the testimony for at another point in his testimony, on cross-examination in the *Hines* trial, he said: "A. My doubt arose in the beginning of the testimony and continued through all the sentences of this police officer who was testifying before me, including this sentence."

That testimony evidently appeared to Judge NOTT to require some explanation. Judge NOTT asked: "By the Court: Q. Do I understand that the doubt originally arose because the officer in testifying said that the colored man threw a package into the car instead of saying this package? A. Yes; and his manner in testifying to it, and his attitude on the stand."

To explain that statement the magistrate gave the following testimony on cross-examination: "Q. Do you mean that you distrusted McCarthy? A. I did. Q. Had you ever seen him before? A. I think I must have; yes, I must have. Q. Anything in your previous experience with McCarthy to lead you to distrust him? A. Well, I wouldn't know how to answer that, I had so many police officers. Q. I am asking you whether on this day you then had any doubt about McCarthy's integrity because of any previous experience; yes or no? A. I don't know. Q. You don't know? A. That is right. Q. Is it not a fact that you held the defendant

in a policy case on McCarthy's testimony just the day before? A. I probably did. * * * Q. The fact is you then held the defendant in $500 bail, didn't you? A. The record shows that, yes, sir. Q. And the charge in that case was a possession of a grand total of fifty-nine policy slips, wasn't it? A. I will have to look at the record. If you say so I will say yes. * * * Q. Isn't it a fact that you held the defendant for a grand total of fifty-nine policy slips in $500 bail on the sole testimony of Officer McCarthy, Edward J. McCarthy? A. That was the usual bail. Q. Now, do you suppose you could give me a responsive answer? A. I did. Q. What is your answer, Yes? A. Yes."

On the cross-examination of Magistrate Capshaw on the *Hines* trial testimony he had given on direct examination as a witness for the defendant was read to him and he was questioned about it in the following manner: " Q. * * * You said, ' Now, it is significant that nowhere in this testimony does this officer say that he saw this package thrown out. He says it was thrown out as the defendant turned the corner. He claims the defendant was in a fast car and that he was only in a Ford car, slower, so that it does not appear he was present when the package was thrown out. He says he went on around the corner.' You gave that testimony yesterday, didn't you? A. I did. * * * Q. Isn't it clear that the proof is that — with the record before us, that the officer testified that this package was thrown out of the car by that defendant? A. The record does not show it. Q. I will read it once more and drop it. ' As he turned the corner of 153rd Street * * * Q. * * * he threw this package out and continued on about 35 or 40 feet, and the car stopped and I pulled alongside of him. I asked the defendant why he threw the bundle out? I held him there until my partner came around the corner. I told my partner to pick up that package. He brought the package over to me. * * * ' Q. Do you still say there was nothing in this record to show that the defendant threw the package out of the car? A. I certainly do. It seems it may have been a conclusion."

In the *Silverstein* case, after positive proof had been submitted of the possession by the defendant of the policy slips, they were offered in evidence but Magistrate Capshaw improperly refused to admit them.

On the trial of the *Hines* case the district attorney cross-examined Magistrate Capshaw with respect to his refusal to admit the package of policy slips in evidence. The answers were so evasive that Judge Nott then interrogated the magistrate as follows: " By the Court: Q. Well, just before we adjourn, why did you refuse to admit them? A. Because, your Honor, I did not feel that the

testimony before me had identified this package which was offered in evidence, as having ever been in the possession of this defendant. Q. If it was in the car with him, it was in his possession, wasn't it? A. Yes. Q. Was there any doubt, if the officer's testimony was true, that that was the package that was in the car? A. Yes, I thought there was considerable doubt. Q. Why? A. Well, from the testimony of the officers saying ' of the same color.' He seemed to have a doubt about it himself. Q. He testified there flew out of the car this package and he asked Jones to bring back this package and Jones brought back that package. A. Yes, but he had started off, your Honor please, by saying, ' A package of the same color,' and he had indicated to me by that statement that he himself was in doubt about it being the same package. Q. He said he saw a package come out of the car ; he saw a package put in the car; he had Jones pick up that package. How could there be any doubt about it? A. Well, if Jones picked up that package, there could not be any doubt about it. Q. Did you have any doubt that Jones picked up the package? A. I certainly did, yes. Q. What package did you think he picked up? A. I don't know. Q. Well, a package thrown from a house window or what? A. Possibly a different package that might have been thrown or placed by somebody else. Q. Well, how could McCarthy tell him to go and pick it up then if it was thrown from a house? A. McCarthy might have seen a package of the same color. Q. Hurtling through the air from a window? A. He does not say he saw it thrown. He says it was thrown, and he may have seen it when he came up to the street, lying there, a package of the same color. Q. That is, as he was driving by he saw a package of the same color lying on the street that somebody else threw? A. Possibly, yes, sir."

Referring to the discharge of the defendant in the *Silverstein* case, Magistrate Capshaw told the jury in the *Hines* trial that the whole plan and pattern of the *Silverstein* case struck him as fantastic and most unbelievable, and on that ground he felt it was his duty to discharge the defendant. Although he had called the defendant as a witness he gave as a reason for dismissing the charge his suspicion that the defendant was a policy banker arranging for his own arrest to welsh on his bets. That would not warrant the discharge of Silverstein in the face of the fact that there was proof that he had the policy slips in his possession.

Magistrate Capshaw was an experienced judge. He was first appointed in December, 1929, and the first of these two cases, the *Klein* case, came on for hearing three years later on December 9, 1932. The *Silverstein* case was heard five months thereafter on May 6, 1933. Magistrate Capshaw was familiar with the rules of evidence and possessed the ability to appraise each witness' testi-

mony by virtue of knowledge, acquired through years of judicial experience which gave him a ready judgment and enabled him properly to weigh testimony. In addition, he had the knowledge and experience gained in deciding many somewhat similar cases over a period of years which should have enabled him quickly to determine whether the defendants should be held. He not only decided numerous similar cases but properly held defendants on much less convincing evidence than that presented in the *Klein* and *Silverstein* cases.

The referee has reported that the magistrate's assertion that the testimony of the police officers was conflicting is without foundation and that the magistrate's misstatements of the testimony were perfectly designed to give credence to this groundless assertion; that the characterization of the testimony of the police officers as contradictory, ridiculous, non-responsive and evasive is without foundation. Our examination of the testimony of Magistrate Capshaw leads us to the same conclusion.

The referee has also reported that the only rational explanation of the disposition of the *Klein* and *Silverstein* cases is that Magistrate Capshaw must have been influenced by considerations entirely outside the record and that in testifying as he did in the *Hines* case the magistrate deliberately attempted to deceive and mislead the jury and to obstruct the administration of justice.

Our examination of the records in the *Klein* and *Silverstein* cases compels us to accept the conclusion of Referee Thacher that in disposing of these cases the magistrate was influenced by considerations outside the record. It is, of course, difficult to establish the mental operations of an individual, but the testimony given by the magistrate in the *Hines* case to discredit witnesses and to justify his conduct in attempting to establish the innocence of Hines proves that his disposition of these policy cases was not prompted by a desire impartially to administer justice. His weak attempt in the *Hines* case to explain his actions demonstrated that he was conscious of the fact that he was endeavoring to excuse conduct which he knew needed explanation.

We are aware of the fact that a judicial officer should not be removed for errors of judgment or for erroneous rulings when made in a sincere attempt to properly perform the duties of his office.

This court, in *Matter of Droege* (129 App. Div. 866), pointed out the necessary elements which must be present to warrant the removal of a judicial officer. For the purpose of this opinion it will suffice to repeat what was there stated to be the principles governing the subject. The court said: " To justify the removal of a judicial officer much more is required than erroneous rulings upon either cases decided before him or the extent of the powers conferred upon

him by law. \* \* \* It is quite impossible to formulate any distinct grounds upon which this power of removal should be exercised as each case must depend upon the particular facts presented, but it is not error of judgment; it is not error in the decision of particular cases; it is not mistakes in the construction of statutes or in the determination of the extent or limitation of his powers, standing alone, which would justify his removal; *but such conduct as satisfies the court that the magistrate has been actuated by unworthy or illegal motives in the exercise of his judicial duties;* or has committed such acts as to justify the inference that either from ignorance or from a perverted character, or from a lack of judicial qualities, he has so administered the power conferred upon him as to show that he should not be continued in office. *A single decision or judicial action, correct or not, which is established to have been based upon improper motives and not upon a desire to do justice, or to properly perform the duties of his office, will justify a removal,* while many improper judicial determinations, or mistakes based merely upon errors of judgment, and without corrupt or improper motives, would not supply the ' cause ' contemplated by the Constitution and the statutes." (Italics ours.)

After careful examination of the testimony in the *Hines, Klein* and *Silverstein* cases and that given before the referee and before this court by Magistrate Capshaw we are compelled to conclude that Magistrate Capshaw was actuated by unworthy and illegal motives in the exercise of his duty in the *Klein* and *Silverstein* cases. That conclusion, which was also reached by the referee, is fortified by the mass of contradictory, evasive and unfounded statements made by Magistrate Capshaw when a witness in the second *Hines* trial in his attempted analysis of the testimony.

We are convinced that Magistrate Capshaw, by his conduct in the *Hines, Klein* and *Silverstein* cases, has demonstrated his unfitness to continue in the office of city magistrate of the city of New York and he is hereby removed.

Townley and Dore, JJ., concur; O'Malley and Untermyer, JJ., concur in the result.

Untermyer, J. (concurring in result). I am unable to concur in the opinion of Presiding Justice Martin in which he sustains the first and second charges against Magistrate Capshaw, which, in substance, allege that he acted upon considerations outside the evidence presented in discharging the defendant in the *Klein* and *Silverstein* cases. I concur in the result only because I consider that, as a witness in the case of *People* v. *Hines*, Magistrate Capshaw, wholly without justification, in effect charged the arresting officers with giving false evidence and with unworthy motives in the performance of their duty.

In our consideration of the case we must disregard the evidence in *People* v. *Hines* except such testimony as was given by Magistrate Capshaw in that case. This requires that we exclude from consideration as evidence of wrongdoing by the magistrate the testimony of Weinberg and Davis given at the *Hines* trial which was incorporated in questions directed to Magistrate Capshaw and denied by him. Magistrate Capshaw ought not to be prejudiced by any evidence given by witnesses other than himself in a proceeding to which he was not a party and in which he could not have asked a question on cross-examination nor called a witness in denial of accusations against him. (*Matter of Lynch*, 227 App. Div. 477.) That principle is not a mere technicality but involves a most fundamental right. (*Matter of Greenebaum* v. *Bingham*, 201 N. Y. 343, 347.) So the referee has correctly held in his report.

Disregarding, then, the testimony of Weinberg and Davis, I am unable to agree that the proceedings in the *Klein* and *Silverstein* cases, read in connection with all the other evidence, require the conclusion that the magistrate was influenced by extraneous considerations. Upon the evidence that is a possible, but it is by no means a necessary, inference, especially if due weight be given to his long record of public service and his excellent reputation. Though I do not at all agree with his disposition of those cases, I find no cause for removal on that account. It is entirely reasonable to believe that the action of Magistrate Capshaw was the result of a misconception of the facts or the law, caused, it may be, by the summary manner in which such proceedings are conducted in the Magistrates' Courts or by the confusion which seems then to have prevailed concerning the law relating to constructive possession of policy slips. For errors such as these, however manifest, the remedy is the reversal of the judgment, not removal of the judge. (*Matter of Baker*, 94 App. Div. 278; *Matter of Tighe*, 97 id. 28.) When, however, in undertaking to vindicate these decisions as a witness in *People* v. *Hines*, the magistrate asserted that he regarded the evidence of the arresting officers in those cases as unworthy of belief on account of testimony which, without justification, he claimed to be inconsistent and incredible, and when, likewise without justification, he suggested that the arresting officers in the *Silverstein* case had acted in collusion with the defendant in making the arrest, he far exceeded the limits which were permissible in attempting his own exoneration. I am constrained, therefore, to concur in the result on the ground that the third charge in part, at least, is sustained.

O'MALLEY, J., concurs.

Respondent removed from office.