*In re:* MODESTA JACKSON SANABRIA, JUDGE OF THE DISTRICT COURT, JUANA DÍAZ PART, Respondent.

No. FC-66-1.      Decided February 21, 1969.

Secretary of Justice, *Mr. Rafael Hernández Colón, José C. Aponte, Fernando Vizcarrondo,* and *Manuel J. Viera Mercado, Charles Figueroa Álvarez* and *Carlos Noriega, Special Prosecuting Attorneys At Large,* for petitioner. *Leopoldo Tormes García, Ángel Viera Martínez, Arturo Cintrón García, Miguel Velázquez Rivera, William Morales Torres, Práxedes Álvarez Leandri* for respondent.

## I

PER CURIAM: On June 17, 1966, the then Secretary of Justice of Puerto Rico, Rafael Hernández Colón, filed with this Court, in accordance with the Act provided for such cases,[1] a complaint against Modesta Jackson Sanabria, District Judge. By means of said complaint, the Secretary of Justice charged respondent with immoral, improper, and reprehensible conduct, and preferred eight charges against her, to which we shall refer in the course of this opinion and which appear copied verbatim in the appendix thereof.

This case was heard by the Full Court during the days from Monday, December 5 to Friday, December 9, 1966. Considerable evidence for the prosecution and for the defense was presented. As it generally occurs in prosecutions[2] where wit-

---

[1] Section 24 of the Judiciary Act, Act No. 11 of July 24, 1952, as amended, 4 L.P.R.A. § 232.

[2] We use the word "prosecutions" in its broad sense. This is not a penal procedure, but a civil one, quasi-administrative, although sui generis. It is a procedure of the Judicial Branch, germane to its function of administering justice, instituted for its self-cleaning, to maintain itself vig-

nesses for and against a person are presented, there were conflicting testimonies, and things affirmed by some and denied by others. However, the delicate mission of weighing such evidence, disregarding what seems exaggeration, separating what he believes to be true from what he believes is not, and finally reaching his own conclusions, is incumbent upon the trier of the facts, the one who sees and hears the witnesses testifying. We have done so.

In this case, as it had to be expected, the evidence for the prosecution tended to support the charges made, and that of the defense, to contradict them. A form of defense—we do not want to call it tactics—which the defense utilized was to seek to establish that the witnesses for the prosecution disliked respondent. Aside from the fact that respondent's conduct in the discharge of her official functions could have given rise to justified animosity, and irrespective also of whether or not there was animosity, and of whether or not it was unjustified, the argument of animosity incurs the fallacy of non sequitur. The witnesses were not being tried. What we should and must decide is whether or not respondent, a district judge, incurred conduct which justifies or which makes her removal from our bench necessary, in defense of the latter, of our state of law, and of the most elemental human rights which all of us claim to defend. It is clear that the accusation of animosity should be considered upon weighing the evidence and in judging the credibility or lack of it on the part of the witnesses. We have done that. Even disregarding what might be the product of the inevitable human passions which a proceeding of this nature breaks forth, after seeing and hearing the evidence and meditating about it, we conclude that the charges were proved.

■ Six of the charges brought, taken independently one from the other, do not as such justify a removal. However,

orous, prestigious, healthy. *In re Marín*, 81 P.R.R. 267, 273 (1959); *Sarisohn v. Dennison*, 281 N.Y.S. 2d 475, 478 (1967).

we believe that two justify it, and further, make it necessary. The others, taking each one separately, could justify a suspension or perhaps a censure. As it has been held, there might be a case where a single irregular act by itself is not a ground for removal of a judge, but a series of irregular acts might well justify it, since a series of irregular acts show a pattern of improper conduct incompatible with the judicial function. *Pérez* v. *Meraux*, 197 So. 683 (1940). The case at bar also can be qualified thus.

■ We consider it useful to explain the following in connection with our statute on removal of judges. The Act provides that "Prosecution [for removal] shall be by complaint returnable to the Supreme Court charging the judge with immoral, improper, or reprehensible conduct, or neglect of judicial duties."[3] That does not mean that each time that the arduous need of filing a complaint against a judge arises, it is necessary to allege all those causes. Some facts may justify those four adjectives, but other facts may justify only one, or two, or three of them. For example, conduct may be improper and reprehensible, but not necessarily immoral. However, immoral conduct is at the same time improper and reprehensible. Neglect of judicial duties may also be charged without charging immorality. Thus, in this case we believe that a charge involves immorality in the most profound sense of the word and the other seven do not necessarily involve immorality, but they comprise improper conduct.

■ Since, as we have indicated, we believe that two of the charges justify and make respondent's removal necessary, we shall merely examine in detail these two charges. One— the gravest of the eight charged—is the fifth charge. It was established that on two different occasions respondent intervened with a witness in order to change the evidence unlawfully. In one case she intervened with policeman Ramón An-

---

[3] See footnote 1.

tonio Rolón and urged him to change his testimony. On that particular, Rolón testified:

"Then the case was set for hearing on March 11, 1965 at nine o'clock in the morning. There in the court, before commencement of the hearing of cases in court, Judge Modesta Jackson, while in her office, called me prior to the trial and urged me to inform that at no time I had seen the damages caused by Loubriel's cattle to Gonzández, and that Ramón Ferrer was a hustler and Loubriel was a good man. That I told the Judge Modesta Jackson that that could not be, because how could I morally say, you know, that . . . the contrary; that I was going to maintain what I had seen; that it was a case of my own knowledge; that I was going to say what I had seen." Tr. Ev. 214.

On another occasion respondent intimidated a 12-year-old boy, in the sixth grade in school, who was going to be a witness in a case, into abstaining from testifying against a certain person. The boy, José A. Santiago Rodríguez, testified as follows:

"Q. What happened after you observed that accident?
A. I went to the court.
Q. With whom did you go to the court?
A. With . . . with . . . with the . . . with the policeman who investigated it.
Q. Whom did you see, if you did see someone, in the court?
A. .    .    .    .    .    .    .    .
Q. With whom did you talk in the court?
A. Ah, with Mrs. Jackson.
Q. With Mrs. Jackson? About what did you talk with Mrs. Jackson in the court?
A. About what I had seen of the accident.
Q. What . . . what did you tell the judge about the accident?
A. Well, I saw . . . I told her that I saw when Domingo Ramos trapped his son.
Q. Did you say that to her?
A. .    .    .    .    .    .    .    .
Q. What did Judge Jackson do or say when you told her that you had seen Domingo Ramos trapping his son?
A. That if I testified against . . . against Domingo Ramos she would send me to the Reformatory.

Q. Where?

A. To the Reformatory.

Q. But you had already testified or not?

A. Yes, I had testified.

Q. To whom?

A. No, not yet.

Q. You had not testified? You had not told the judge what you had seen?

A. No, not yet.

Q. And at what moment did the judge tell you that she would send you to the Reformatory?

A. When I was going to explain what had happened.

Q. When you were going to explain. Did you testify to the judge?

A. No, I did not because she did not let me.

Q. Why did you not testify to her?

A. Because she told me that.

Q. Because she told you what?

A. That she would send me to the Reformatory if I testified against Domingo Ramos.

Q. Then, on the basis of what she told you, that she was going to send you, it was that you did not testify?

A. I did not dare speak." Tr. Ev. 240–242.

This fifth charge is the charge we have said that involves an immorality in the most profound sense of the word. It involves the most serious possible injury to the judicial proceeding by a person who should be most watchful of its purity: the judge. It constitutes a mortal wound to the heart of the judicial proceeding: the credibility of the evidence. There is no doubt that a judge who commits that practice cannot remain on the bench. Such conduct includes such "taint of immorality . . . making the judge unfit to act or command public confidence as a judge."[4]

---

[4] Report of the Judiciary Act Drafting Committee, cited in the history of § 232 of Title 4 of L.P.R.A., and in the opinion of Mr. Justice Hernández Matos, in which Mr. Justice Santana Becerra concurs, in *In re Gallardo*, 81 P.R.R. 18, 64 (1958).

It has been held that favoritism in the performance of judicial duties constitutes corruption as disastrous in its consequences as if a bribe had been received. The willful abuse of judicial discretion has been described as the most oppressive and injurious kind of official misconduct. *In re Bolte*, 90 N.Y.S. 499, 512 (1904). It has also been held that a decision or judicial action based upon improper motives, or upon favoritism toward one party or his attorney, is a ground for removal. *In re Capshaw*, 17 N.Y.S.2d 172, 186 (1940); *In re Bolte, supra.* It has also been decided that the conduct of a judge inducing a witness to withhold evidence, or to abstain from testimony, is a justified cause for his removal. *Kirkpatrick* v. *State*, 9 S.W.2d 574 (1928).

The other charge which we consider extremely serious, since it is injurious to the fundamental human rights of the dignity of the human being and his protection against abusive attacks on his honor, reputation, and private life,[5] is the seventh charge. Especially, this is so if it is borne in mind that respondent incurred it on more than one occasion, since the second charge is of a like nature. These two charges comprise two different occasions on which respondent abused by word two ladies in court without justified cause. In the facts comprised within the seventh charge, respondent made Emma Rita Franceschi appear in court by summons served by a policeman, for the sole purpose of reproving her without any reason therefor and threatening to send her to jail. This seventh charge, together with the second one, constitute a pattern of improper conduct and show by themselves abuse of the public power entrusted to respondent.

As to the other charges, it suffices to say the following. Respondent essentially admits the fourth charge. She denies it "for the manner in which it is drafted" but "accepts having performed the marriage ceremony of the persons referred to

---

[5] Constitution of the Commonwealth of Puerto Rico, Art. II, §§ 1 and 8.

in said charge," two girls 13 years old. Said charge constitutes two clear violations of the law. We shall not consider as immoral respondent's conduct as to this charge, but there is no doubt that it was improper.

The third charge refers to an order entered by respondent in the following terms: "Bonds shall not be admitted after 10:00 p.m., neither by the judge nor by the clerk of this Division." However, this charge involves failure to perform the duties which constitutes, in the terms of the statute, "neglect of judicial duties." Said dereliction of duty could have caused important violations of constitutional rights of the citizens. Some courts have considered that the unlawful refusal to admit bonds, which otherwise were admissible, is a transgression which warrants removal. *Saint* v. *Meraux*, 111 So. 691 (1927).

We have mentioned the second, third, fourth, fifth, and seventh charges. As to the remaining charges, the first, the sixth, and the eighth, they refer to personal conduct of the judge in public places. She is charged with frequenting public places with persons of the underworld (bolita, operator of a house of ill fame) and other forms of undesirable conduct. Even if we would assume the attitude of disregarding a great part of the evidence for the prosecution on that particular, the defense witnesses themselves produced specific details which show that there is a sufficient measure of truth in those accusations as to make us consider them reprehensible. For example, one of the persons with whom respondent frequented public places was Daniel Cintrón Torres. Against this gentleman the courts have rendered at least the following eleven criminal judgments: three years in the penitentiary for transporting women for immoral purposes; from two to nine months imprisonment in jail for possession of weapons; three months in jail for violation of § 132 of the Penal Code (bribery of witnesses); three months in jail for aggravated assault and battery; three months in jail for another offense

of aggravated assault and battery; three months in jail for another offense of aggravated assault and battery; three months in jail for aggravated assault and battery; from two to five years of imprisonment in the penitentiary for attempt to kill; $50 fine for attack to commit homicide; and two sentences of from one to two years of imprisonment in the penitentiary for violations of §§ 6 and 7 of the Weapons Law.[6]

Witness for the defense, Emilio Colón Soto, testified that Daniel Cintrón operates a motel called "La Arboleda"; that he has heard that he was "at Atlanta and those things."

Another defense witness, Hipólito Díaz, qualified the reputation of Arcadio Ramos (another person who was respondent's frequent companion) as "questionable" and "ill." Another witness for the defense, Leopoldo Vega, testified that Daniel Cintrón visited the court; that respondent moved to a house, property of Daniel Cintrón, located in Del Carmen Development in Juana Díaz, and as to Daniel Cintrón's reputation, he testified as follows:

"Q. Do you know .... You say that you knew about Daniel Cintrón's reputation?

A. Yes, sir.

Q. What was that gentleman's reputation?

A. Well, he has a house of .... How do you call it? A motel.

Q. That it is a house of what?

A. Well, a motel.

Q. Has he ever been accused of houses of ill-fame?

A. Yes, sir; he has been accused.

Q. In relation to what house, what business, or what establishment? Is it not in relation with that same motel?

A. Yes, sir." Tr. Ev. 67.

Another witness for the defense, Sergeant Hipólito Díaz López, testified that on one occasion respondent told him to witness an investigation being carried out by a police captain so that he would later tell her what was done there, to

---

[6] Petitioner's Exhibits 1-B, 1-A, 5, 5-E, 5-F, 5-G, 5-H, 5-I, 5-C, 5-D, and 5-A.

which the witness refused. In connection therewith, the witness testified further on as follows:

"Q. Then, what did she tell you as a result thereof when you told her that it was confidential, that you could not do what she requested?

A. I do not remember.

Q. You do not remember. See whether what she said was as follows: 'The marshal should better not molest me anymore because if I cannot lay hold of him before for something unusual he may do, I am going to block his appointment as marshal when the same goes to the Senate in the month of March next year.'

A. She made those comments, but . . . .

Q. She made them; now you remember, is not that so, that she made that comment?

A. Yes." Tr. Ev. 22.

■ Even if for the purposes of weighing the evidence we disregard liberally a great part of the statements made by the witnesses for the prosecution, a considerable residue of said evidence remains which we believe is true, reinforced by the light which on these facts is shed by the testimonies of the defense witnesses themselves, which makes us conclude that all the charges were proved and that, taken as a whole, they warrant respondent's removal. The evidence showed that respondent is not conscious at all of the nature of the office of a magistrate, which renders her unfit to exercise the difficult task of a judge on our bench. The foregoing shows a pattern of conduct over too long a period (the charges include facts which occurred in the years 1963, 1964, and 1965), which has made her unworthy of the honor and confidence entrusted to her and which offended equally the society and defrauded public values of significant worth entrusted to her.[7]

---

[7] See opinion of Mr. Justice Santana Becerra in *In re Gallardo*, 81 P.R.R. 18, 74, 77 (1958).

## II

We believe that the best reply to the dissenting opinion consists in a careful reading of the foregoing pages of the opinion of the Court in this case. Each averment of facts made therein is connected to the corresponding page of the record supporting it. We indicate also the circumspect and judicial manner used by the Court in its opinion.

However, the tone of the dissent makes it necessary to make some additional contentions.

A cautious submission to the facts shows that the dissenting opinion contains exaggerations and insinuations not supported by the evidence and a serious distortion which we turn to indicate. It is exaggerated out of any proportion and it is sought to characterize of "almost a state of police siege" the statement of Police First Lieutenant Julio López, in his testimony in the sense that he was instructed to inform on the irregularities of the judges. It is said that those were "orders from the Office of the Superintendent." Let us see how that argument is deflated as soon as we examine with fidelity the record. The truth is that that instruction was not the initiative of the Police, but it originated in the Court Administration. It is thus stated in the minutes of a routine meeting of police officers, part of which minutes was entered in the record, and in which meeting, Mr. Olivo, Legal Adviser of the Police, informed about his interview with the General Administrator of the Courts. At page 130 of the transcript of evidence you can read the following:

"Mr. Olivo distributed a recent opinion of the Supreme Court on arrests. He talked about his interview with Mr. Mangual, General Administrator of the Courts, who wants to know where irregularities of the judges, absences during weekends, problems in submitting cases, adverse opinions or acts, insults, and postponement of cases by attorneys waiting for specific judges, are observed. These reports should be sent to Field Operations."

We do not believe that for the application of the law there should be two standards. One for the citizens, public servants in lower ranks—policemen, health inspectors, etc.—and another for those in upper ranks. If there is nothing wrong in seeing that policemen, health inspectors, and prosecuting attorneys do not commit irregularities, there is also nothing intrinsically wrong in seeing that the judges do not commit them. Considering the high quality of our Judiciary, that occurs very rarely. It happened in the case at bar. The correct defense of the Judiciary and the one we should expect from those who have the constitutional duty of watching over the proper administration of the courts, consists in protecting it from persons guilty of respondent's conduct, since that is the kind of conduct which could belittle the high esteem and respect which our Judiciary deserves from all of us.

It preoccupies this Court that so much time has elapsed between the hearings of this case in this Court in December 1966 and its decision at this time. In cases of this nature, if the complaint is untenable, better justice is done to the judge concerned by deciding it promptly. If the complaint is well-founded, it would serve the best interests of our Judiciary, of the administration of justice, and of the country, to decide it also as soon as possible.

For the reasons stated in Part I of this opinion, respondent's removal from the position of district judge shall be decreed.

The Chief Justice and Mr. Justice Santana Becerra dissented in a separate opinion.

Mr. Justice Pérez Pimentel, Mr. Justice Hernández Matos, and Mr. Justice Torres Rigual did not participate herein.

—O—

*In re: Modesta Jackson*

FC-66-1

## APPENDIX

### FIRST CHARGE

That on or about a certain day in October 1964, during the nighttime, respondent, Modesta Jackson Sanabria, at the time she was acting as Judge of the District Court of Puerto Rico, Juana Díaz Part, met at a business property of Jaime Torres, located in Guanábano Ward of Juana Díaz, with several persons of questionable reputation in the community of Juana Díaz, being accompanied, moreover, by the man named Daniel Cintrón, who had been convicted by the United States District Court for the District of Puerto Rico of the offense of white slavery. In this meeting, respondent Modesta Jackson Sanabria drank intoxicating liquor in excess, and upon being in apparent state of intoxication, observed immoral, improper, and reprehensible conduct on the part of a district judge.

### SECOND CHARGE

That on or about March 29, 1965, respondent Modesta Jackson Sanabria, at the time she was acting as Judge of the District Court of Puerto Rico, Juana Díaz Part, while she was on the premises of the District Court of Juana Díaz, abused by word Ritalina Ramos Cruz, who had appeared in court to file a complaint against a neighbor on account of a problem she had, the respondent judge telling said lady that her house was a house of ill fame where couples went to have sexual intercourse, ordering Julio López López, Lieutenant of the District Police, to conduct an investigation on Ritalina Ramos Cruz' conduct and to inform her of the result thereof. The result of the investigation conducted by the police lieutenant was that Ritalina Ramos Cruz was highly reputed in the community, was a married woman with children who lived peacefully with her family.

This conduct is immoral, improper, and reprehensible on the part of a district judge.

## THIRD CHARGE

That on or about December 23, 1963, respondent Modesta Jackson Sanabria, at the time she was acting as Judge of the District Court of Puerto Rico, Juana Díaz Part, entered the following order: "Bonds shall not be admitted after 10:00 p.m., neither by the judge nor by the clerk of this Division." This order affected the constitutional right of any accused to remain out on bail before a judgment of conviction is rendered.

This conduct of respondent Modesta Jackson Sanabria, is unlawful, improper, and reprehensible on the part of a district judge.

## FOURTH CHARGE

That on or about March 30, 1964, respondent Modesta Jackson Sanabria, at the time she was acting as Judge of the District Court of Puerto Rico, Juana Díaz Part, performed the marriage ceremony of the girl María Lourdes Marrero and José Luis Cosme Torres, said girl being under 14 years of age, fact known by respondent Modesta Jackson Sanabria. The girl who contracted marriage, María Lourdes Marrero, was the prosecutrix in a case of statutory rape which had been submitted by the Police of Juana Díaz, to the respondent judge for determination of probable cause.

That likewise, on June 17, 1964, respondent Modesta Jackson Sanabria, proceeded to perform the marriage ceremony of the girl Sonia Santiago Muñoz, 13 years of age, and Jaime Hernández García, the respondent judge knowing that she was precluded from performing said marriage because the contracting girl was under 14 years of age. In this marriage the contracting girl was also the prosecutrix in a case of statutory rape which the Police of Juana Díaz had submitted to the respondent judge for determination of probable cause.

This conduct of respondent Modesta Jackson Sanabria, is extremely improper, unlawful, reprehensible, and immoral, in the discharge of her duties as district judge.

## FIFTH CHARGE

That on or about a certain day in March 1965, respondent Modesta Jackson Sanabria, at the time she was acting as Judge of the District Court of Puerto Rico, Juana Díaz Part, and while

she was on the premises of said court, intervened with policeman Ramón Antonio Rolón, badge No. 2387, urging him to change his testimony in a criminal cause which had been set for hearing before that court, People of Puerto Rico v. Jorge Loubriel, on malicious mischief.

On another occasion, respondent Modesta Jackson Sanabria, while she was carrying out an investigation of a traffic accident which had occurred in Juana Díaz, intervened with the minor José Antonio Santiago Rodríguez, so that the latter would not testify against the alleged defendant, threatening to send him to an institution for minors.

This conduct on the part of respondent Modesta Jackson Sanabria is extremely immoral, unlawful, improper, and reprehensible in the discharge of the duties of a district judge.

## SIXTH CHARGE

That on or about a certain day in September 1965, respondent, Modesta Jackson Sanabria, at the time she was acting as Judge of the District Court of Puerto Rico, Juana Díaz Part, observed improper, immoral, and reprehensible conduct in the business of Emilio Rivera, located in Alas de la Piedra Ward, Orocovis, Puerto Rico, accompanied by Daniel Cintrón, Domingo Santiago, Arcadio Ramos, known as Cale, Manuel Álvarez Acevedo, known as El Tuerto, and other persons violators of the law, drinking alcoholic beverages in excess and being in an apparent state of intoxication.

This conduct is extremely immoral, improper, and reprehensible on the part of a district judge.

## SEVENTH CHARGE

That on or about a certain day in June 1964, respondent, Modesta Jackson Sanabria, at the time she was acting as Judge of the District Court of Puerto Rico, Juana Díaz Part, observed immoral and improper conduct in making Emma Rita Franceschi Serrano go to her office by summons served by a policeman, for the sole purpose of reproving her in an inconsiderate manner without any reason or complaint against the said lady.

This conduct of the respondent judge is extremely immoral and improper in a district judge.

### EIGHTH CHARGE

That in or about the middle of 1965, respondent, Modesta Jackson Sanabria, at the time she was acting as Judge of the District Court of Puerto Rico, Juana Díaz Part, and while she was attending a party in Ward Maravilla of Juana Díaz, Puerto Rico, observed improper, immoral, and reprehensible conduct upon sitting, in the presence of other persons, on the lap of one of the men who were at the party.

This conduct is extremely immoral, improper, and reprehensible on the part of a district judge.

—O—

MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ, with whom MR. JUSTICE SANTANA BECERRA concurs, dissenting.

San Juan, Puerto Rico, February 21, 1969

The Court has decreed the removal of respondent as district judge upon determining that "all the charges were proved and that, taken as a whole, they warrant respondent's removal." I cannot concur with that result.

I also, as part of the Court which heard the extensive and conflicting evidence introduced in this proceeding during five consecutive days, have searched the bottom of truth which the trier always wants to discover in the evidence presented before him, in order to reach the moral conviction of the certainty of the facts, thus being able to satisfy his judicial conscience.

I believe that in a proceeding against a judge for charges of immoral conduct, we should not be less exacting in the standard on the degree of evidence required for removal—because the proceeding is characterized as sui generis—than in the standard on the degree of evidence required for a conviction in a proceeding of a criminal nature. The reason seems to me to be evident: in a criminal proceeding freedom may be lost, but it may be recovered. In a proceeding against a judge for charges of immoral conduct the removal by itself destroys

the reputation of a human being—and that is indeed very difficult to recover.

The evidence against the respondent, in general, is vitiated by interest, animosity, persecution, and some indication also of concerted conspiratorial action, which does not carry to my conscience, in particulars considered most serious by the Court, the moral conviction of its credibility; and even in some of those particulars, because of the attendant circumstances, as in others which have not been considered so serious, it is insufficient and weakened in its essence for the strictness of a penalty of removal, even if we disregarded the evidence for the defense. The factors of interest, animosity, persecution, concerted conspiratorial action, are vital factors of the judicial procedure to determine the reliability of the testimonies and to be able to reach with reasonable certainty to the entrails of the truth.

As background in the general picture of the evidence for the prosecution an alarming and dangerous situation may be noted, situation which could be characterized of almost a police siege of the judiciary, and in this case of respondent, by virtue of oral and written orders of the Office of the Superintendent—from and prior to January 14, 1965—to observe the conduct "of all the magistrates, to report the most insignificant irregularity committed by them." This picture of police vigilance arises during complainant's testimony—which I copy below—Police First Lieutenant, Julio López López, who was stationed in Juana Díaz, seat of the Part of the District Court presided by the respondent, during part of the time when the latter exercised the duties of her office there, and against whom the latter preferred charges before the Police Superintendent:

"MR. JUSTICE BLANCO LUGO:

Q. Lieutenant, this morning when you were testifying, you indicated, upon answering questions of Mr. Viera Martínez, that

you had received written orders from headquarters, to observe the conduct of Judge Jackson.

A. Umjú. Of all the magistrates, to report the most insignificant irregularity committed by them.

Q. From what headquarters did you receive orders to observe the conduct of the judges?

A. Eh . . . . From general headquarters and I have the document there.

Q. Do you have the document with you?

A. Yes, sir. I can show it to you.

Q. I would like to see that document.

MR. JUSTICE SANTANA BECERRA:

I also.

A. Oral and written orders.

MR. JUSTICE BLANCO LUGO:

Q. Would you please find the document?

A. With pleasure. (Pause.) And we have two more circular letters.

MR. CHIEF JUSTICE:

Go to the witness stand.

A. Excuse me. We have two more circular letters, to inform any irregularity of any officer, now, recently.

MR. JUSTICE BLANCO LUGO:

Q. But, is there any specific one, on the judges?

A. We could not call this a circular letter, but these are meetings held periodically by the Superintendent with all the officers, or higher officers, then, they prepare the minutes, and then the area commander meets with all the district commanders who are informed about the matter, and then they send a written report of the agreements.

Q. Would you please show that document, both to the prosecuting attorneys and to the defense?

A. Let me look for it and excuse me. (Pause.) This is the document. I say, and something. Notice the list of the persons present, and multiple matters are discussed, among them that. Let me see where it is. And this was the greatest reason for my sending that complaint, because I was already neglecting my duties. See it, here it is underlined in red letters. That arrived before I sent the complaint.

Q. Do the parties have any objection for leaving that document in evidence for the illustration of the Court?

MR. VIERA MARTÍNEZ:

On our part, none.

PROSECUTING ATTORNEY APONTE:

None.

PROSECUTING ATTORNEY NORIEGA:

On our part, none.

PROSECUTING ATTORNEY APONTE:

On our part, none. I was going to enter it in the record. To read the pertinent part for the purposes of the record. It is very important in connection with the record.

MR. JUSTICE RAMÍREZ BAGES:

What is the date thereof?

MR. VIERA MARTÍNEZ:

January 14, 1965.

A. Eh . . . May I ask a question?

MR. CHIEF JUSTICE:

A moment.

A. It contains many things there.

PROSECUTING ATTORNEY APONTE:

Gentlemen of the Court, appealing for the purity of the proceeding, since that memorandum includes other things which have nothing to do with the matter involved in this proceeding. . . .

A. Many confidential things there.

PROSECUTING ATTORNEY APONTE:

We would have no objection to enter in the record everything concerning the judges, to which the witness referred, answering the question made by Mr. Justice Blanco Lugo, it is there, in red. It has other matters.

MR. VIERA MARTÍNEZ:

Well, it seems to me that the . . . the . . . the document can remain, because it refers that among them in that meeting newspapermen were present, so that, it was not a meeting, possibly private, but . . . .

PROSECUTING ATTORNEY APONTE:

But the pertinent part of that document, in my opinion, brought by Mr. Justice Blanco Lugo, is about the judges.

PROSECUTING ATTORNEY FIGUEROA:

And that is the only material and pertinent thing.

PROSECUTING ATTORNEY APONTE:

That is the pertinent part.

MR. CHIEF JUSTICE:

The proposition made by the prosecuting attorney is to enter in the record that part?

PROSECUTING ATTORNEY APONTE:

That which is in red, Your Honor, yes, that is our proposition.

MR. CHIEF JUSTICE:

To enter it in the record?

PROSECUTING ATTORNEY APONTE:

Yes, sir.

MR. CHIEF JUSTICE:

Any objection?

MR. VIERA MARTÍNEZ:

No, no objection.

MR. VELÁZQUEZ RIVERA:

No objection.

MR. TORMES:

No objection.

MR. CHIEF JUSTICE:

Then . . . .

MR. VIERA MARTÍNEZ:

Would the court allow me to make one or two additional questions?

MR. CHIEF JUSTICE:

Yes, what does the attorney say?

MR. VIERA MARTÍNEZ:

Would the court allow me to make one or two additional questions on this particular . . . ?

MR. CHIEF JUSTICE:

We are going to decide within a moment.

MR. VIERA MARTÍNEZ:

Yes, sir.

MR. CHIEF JUSTICE:

Within a moment we shall continue.

MR. JUSTICE BLANCO LUGO:

To the secretary, if you please.

MR. CHIEF JUSTICE:

The document is to be identified as Exhibit two, Roman. The part framed within a red line, which refers to the judge shall remain in the record, and the entire document shall remain in the Court because of its confidential nature, to enter in the record the part referring to the judge, which is framed within red lines. The secretary may begin to read it.

SECRETARY:

'Conduct of the judges. Mr. Olivo distributed a recent opinion of the Supreme Court on arrests. He talked about the interview with Mr. Mangual, General Administrator of the Courts, who wants to know where irregularities of the judges, absences during weekends, problems in submitting cases, adverse opinions or acts, insults, and postponement of cases by attorneys, waiting for specific judges, are observed, these reports should be sent to field operations.'

MR. CHIEF JUSTICE:

That refers to a document of January 14, 1965, to which the witness referred, Lieutenant López López. Continue attorney.

MR. VIERA MARTÍNEZ:

With the leave of the Court?

Q. Eh . . . Lieutenant López, eh . . . was it on the basis of that memorandum that you, eh . . . decided to look for evidence with respect to Judge Jackson?

A. Well, that was the reason why I began taking notes and those things, because that was a specific order and the zone commander, who lives there and had knowledge, by information, of all those irregularities of the judge and trips. . . .

Q. Yes. But, was it on the basis of that memorandum that you mentioned?

A. That influenced also very much.

Q. Influenced very much. Was there any other memorandum previous to that of January 14, 1965?

A. Eh . . . Orally, because that covers several months; orally we had been told to inform any irregularity of the judge.

Q. Irregularities of whom, of the judge?

A. Of the judges."[1]

Considering this general picture and without seeking to make an analysis of the individual testimony of each witness as to his animosity or interest against respondent, let us see briefly some specific aspects of the case.

The Court considers that the gravest of the eight charges is the fifth charge, which consists of two parts; and it considers proved that on two different occasions respondent intervened with the witnesses in order to change the evidence illegally. On the first occasion—it was concluded by the Court —the respondent intervened with policeman Ramón Antonio Rolón and urged him to change his testimony. Rolón's testimony is simply incredible, because the charge made by this witness to respondent, that she urged him, moments before a

---

[1] Section 24 of the Judiciary Act approved on July 24, 1952, subsequently amended on several occasions, establishes the procedure for the removal by the Supreme Court of the Judges of the Court of First Instance, which "shall be by complaint returnable to the Supreme Court charging the judge with immoral, improper, or reprehensible conduct, or neglect of judicial duties." After giving the parties an opportunity to be heard, together with the witnesses, "if the Court shall find the charges, or even part of them, sustained, it may censure or suspend the offending judge or remove him permanently from his office as it shall determine the most appropriate penalty under the circumstances."

It has never been a rule or practice of this Court, nor of the Office of Court Administration—because it would be unjust to the judicial prestige and independence and to our constitutional system—to entrust the police with watching over the members of the judiciary; and much less to characterize a priori as "irregularities of the Judges" what in the text of the cited document entered in the record of this proceeding in the course of Lieutenant López López' testimony, is called "adverse opinions or acts," or to part from the basis that the magistrates utter "insults" or that there are "attorneys postponing cases, waiting for specific judges," whereas it would constitute an undesirable police state which would submit judges and attorneys, in their judicial and professional functions, to the supervision and organized vigilance of the police.

The copied text of the document cited does not represent the view which in the same is attributed to the Office of Court Administration, and in the same—which is not a document originated in the Judicial Branch— judicial and professional acts, which are not upon the police to judge, have been unduly included, certainly by error.

trial for malicious mischief against a defendant named Loubriel (in which case respondent had determined probable cause and it was going to be heard before another magistrate that day) to testify "that at no time I had seen the damages caused by Loubriel's cattle to González, and that Ramón Ferrer was a hustler, and Loubriel was a good man" is not connected to any rational motivation or interest on the part of respondent for the latter to urge such witness to deny a fact which served the respondent herself as basis to make her determination of probable cause against Loubriel. On the other hand, both the prejudiced party, Ramón Ferrer, and the overseer of his farm, were eyewitnesses of the facts charged as offense and both were present at the court that day to testify. What indeed appears, on the contrary, from the examination of this witness, as well as from respondent's documentary evidence, is that the latter had previously determined probable cause against Rolón for an offense of aggravated assault and battery. (Respondent's Exhibit F.) That indeed establishes connection of interest, motivation or animosity to discredit his testimony, aside from the fact that the testimony of attorney Wilfredo Colón Pagán, who testified as witness for the defendant and whose testimony I believe entirely, dissipates any sign of certainty as to the charge made against the judge. Said attorney testified as follows:

"Q. Colleague Colón, did you know Jorge Loubriel?
A. My client.
Q. Could you tell us whether on any occasion you represented him in any matter prosecuted in the District Court of Juana Díaz?
A. Yes, sir.
Q. What matter?
A. It was a case where my client was accused of malicious mischief. Because some animals belonging to him had gone astray and had caused damages in some cultivations property of another person whose name I do not remember now.

24

MR. VIERA MARTÍNEZ:

Q. Could you tell us who was the judge who determined probable cause in this matter?

A. The determination of probable cause was made by Judge Modesta Jackson.

Q. And then the case was set for hearing?

A. Yes, sir.

Q. Do you appear as Loubriel's counsel at this trial?

A. It was so.

Q. Who was the magistrate who presided the court at the time the trial was held?

A. Hon. Norberto Benítez.

Q. Do you know policeman Ramón Antonio Rolón?

A. Yes.

Q. Did that policeman have any relation to that case?

A. He was the policeman who investigated and submitted the case to Judge Jackson.

Q. Do you remember having seen policeman Ramón Antonio Rolón at the time the trial was going to be held?

A. Yes, sir.

Q. Can you indicate, as briefly as possible, how was the proceeding developed in court?

A. The case was called and Loubriel appeared represented by this attorney. The witnesses were sworn in and when policeman Rolón took the witness stand we raised a question of law to the court and the court sustained it. Our contention consisted in that a criminal action did not lie against our client for the damages which his animals had caused to that vegetation or to the produce, and rather what was appropriate was an action for damages where an absolute liability is required and the judge accepted our motion, our petition; he sustained it and recommended the prejudiced party to bring a civil action against our defendant."

About the second part of the fifth charge the Court concludes that respondent "intimidated a 12-year-old boy, in the sixth grade in school, who was going to be a witness in a case, into abstaining from testifying against a certain person." The boy, José Antonio Santiago Rodríguez, who at the time of the hearing before this Court said that he was 12 years

old, testified that as a result of an accident which he had witnessed in Juana Díaz, where Domingo Ramos "trapped" his son Carlos Ramos with a pickup, he was taken to the court together with another minor who according to him had also seen the accident, and that there respondent told him that if he testified against Domingo Ramos, she would send him to the reformatory, for which reason he did not dare testify. This boy, because of his hesitations and lack of memory as to some facts and circumstances which form part of the specific moment when he says that the judge intimidated him into abstaining from testimony, is slightly reliable, if not incredible, to declare respondent guilty of a conduct which according to the words of the Court, "involves an immorality in the most profound sense of the word," constitutes "a mortal wound to the heart of the judicial proceeding: the credibility of the evidence." But aside from the slight reliability in the testimony of this witness, his testimony is the only one offered to this Court in order to establish that part of the fifth charge, despite the fact that according to said minor, when the judge threatened him with sending him to the reformatory if he testified against Domingo Ramos, the policeman, Domingo Ramos (the defendant), Carlos Ramos (the victim), and an attorney were present. (Another minor who was also present, had died, at the time of the hearing.) However, Sergeant Hipólito Díaz López, who submitted the case to respondent, upon testifying before this Court as witness for the defendant, said that on that occasion the minor José Antonio Santiago Rodríguez and another minor, surnamed Ortiz, did not come to an agreement, one said one thing and the other another, and then the judge ordered the sergeant to go to the scene of the accident with the witnesses so that they would explain the facts on the spot and upon returning before the judge, Domingo and Carlos Ramos, Mr. Wilfredo Colón, and the deputy-marshal Díaz being present, the minors continued being at variance between themselves, the judge determining

that there was no probable cause. The judge, according to Sergeant Díaz López, at no time threatened or urged the minors to abstain from testifying against Domingo Ramos. "Nothing of that source occurred there," testified the sergeant. The judge, on the contrary, told the minor surnamed Ortiz that he could not lie, that he should tell the truth.

Attorney Wilfredo Colón Pagán, who represented defendant Domingo Ramos at the hearing on determination of probable cause before the respondent, in his testimony before this Court ratified the testimony of Sergeant Díaz López as to the discrepancy and confusion between the two minors in explaining the facts, and entirely controverted the testimony of the minor on which this charge was based, denying that the judge had made any threat to such minors, and explaining: "the form and the manner in which these minors testified was confusing, because one said that his back was turned, another said that he had only heard the squeak of the brakes, that is, that there was no logic in the manner in which they located themselves, there was no logic in what they said, and for the purposes of being able to determine the credibility, the judge ordered Sergeant Díaz to go with the minors to the place where they said that the accident had occurred, so that they would show him there where they had been. Then, the sergeant, in turn, would inform the court."

To questions of one of the Justices of this Court, attorney Colón Pagán testified, further, the following:

"MR. JUSTICE BLANCO LUGO:

A question, colleague. That hearing at which you appeared, was it several days after the facts which gave rise to the complaint had occurred, or the same day?

WITNESS:

It was the same day, Hon. Justice.

MR. JUSTICE BLANCO LUGO:

The same day? Do you know whether the policeman, or the person who submitted the case had prepared any proposed complaint or accusation?

A.—I do not remember, Your Honor.

Q.—Ramos' son, that is, the victim, did he testify before the judge?

A.—Yes. He testified and the case is that this person has been mentally unsound for some time and frequently went to his father's business and insulted him, demanding the inheritance which belonged to him. When the father tried to calm him down, or something, then he threatened him with killing Domingo's foster daughter, that is, a girl they are rearing. She did not know that she was an adopted daughter. And he went to Domingo's residence and threatened with knives and things. And the family was upset. Then they had to call Domingo immediately and it was a quarrel between father and son for an inheritance.

MR. JUSTICE BLANCO LUGO:

Then definitively, the day you appeared representing Domingo Ramos was the same day of the accident?

WITNESS:

The same day.

MR. JUSTICE BLANCO LUGO:

Thank you.

PROSECUTING ATTORNEY FIGUEROA:

No more questions.

MR. JUSTICE SANTANA BECERRA:

The son was present there?

WITNESS:

Yes, sir.

MR. JUSTICE SANTANA BECERRA:

Did he show bruises, wounds, or anything?

WITNESS:

We did not see any bruises or wounds and it is so much so that the one who was inciting him to testify against the father was his wife, and as soon as he left the court a group of persons met with Domingo himself, Domingo Ramos, to see that the son came out walking normally. Not walking, he was almost running. This was rather a family feud which will never be settled."

I cannot see how this Court can declare proved, in its two alleged manners, a charge of such serious moral implications

with evidence of such dubious credibility and entirely controverted, without any indication of rational motivation or ground in the human conduct for the dereliction of duty attributed to the respondent.

The other charge considered extremely serious by the Court is the seventh, by which it is alleged that respondent had summoned Emma Rita Franceschi to appear before her "for the sole purpose of reproving her in an inconsiderate manner without any reason or complaint" against her.

Although it was improper for respondent, as judge, to make use of the coactive power of the Court to make a person against whom she had any personal reason for resentment appear before her for the purpose of reproving her, which in any case, if proper, such reproving would have been incumbent upon a different judge to make—if respondent had complained before another magistrate of the facts which gave rise to the summons of Mrs. Franceschi—I believe that the previous relation between both (respondent had lived during some months in Mrs. Franceschi's house) could have led her to underestimate the importance of that erroneous action. To questions made by the prosecuting attorney, Mrs. Franceschi testified before this Court:

"Q.—Did Judge Jackson explain to you the object of the summons, the purpose of the summons?

A.—She explained to me that she had summoned me on that occasion to reprove me for the fact that, as she had been told, I used to say that I maintained her in my house, that she was colored, and that she wanted to tell me that that affected her morals and conduct, and that on this occasion she was reproving me, but that on any other occasion she would imprison me.

PROSECUTING ATTORNEY VIZCARRONDO:

Q.—In relation to that statement made by the judge, did you answer her?

A. Well, I merely told her that it seemed to me that the reason, you know, for the summons, was something apparently, what we call in general terms, old wives' tales, because it was something so . . . so . . . . . In the first place, I had not made those com-

ments. She told me that an employee of the business establishment in front of my house had told her that I had made those comments to another person while sitting on the porch of my house. That . . . incidentally, she mentioned the business establishment one day when it was closed, you know, so that I told her that I had not said it. It was her word against mine. Of course, she had the privilege to accuse me and I the privilege to defend myself.

Q.—Then, there was no case, no complaint against you?

A.—Only that she gave me that reason. There was nobody else but she and I in that room.

:—Nothing more."

Considering what Mrs. Franceschi testified at the hearing, it seems to me that the seriousness of the finding of the Court on this charge is excessive. As to the second charge— by which it is alleged that respondent abused by word another lady in the course of an investigation, stating that the latter had a house "of ill fame where couples go to have sexual intercourse"—in my weighing of the evidence presented, because of the statements and attitudes of the witnesses when testifying and considering the general vice of the evidence for the prosecution which I have previously indicated, I cannot consider it established.

As to the fourth charge, which refers to two marriage ceremonies performed by respondent of two girls thirteen years old, it should be pointed out that although respondent performed said marriages—despite the indications made by an experienced officer in her Division, Marshal Delfín Cosme, and the evidence on the minors' age consisting of the birth certificates—in my opinion, powerful mitigating circumstances of law and of fact exist, which diminish respondent's neglect of the minors lack of legal capacity to contract marriage at their respective ages.

Subdivision 1 of § 83 of the Spanish Civil Code, "which is the directory basis of subdivision 3 of our § 70," *Fernández.* v. *García*, 75 P.R.R. 443, 447 (1953), as it governed in Puerto Rico until the adoption of our revised Civil Code and con-

tinues in force in Spain, established the legal age of puberty for males at 14 years and for females at 12 years. Males under the age of 14 and females under the age of 12 lacked legal capacity to contract marriage. Our Civil Code, following the recommendations of the Commission to Compile and Revise the Laws of Puerto Rico, composed of Commissioners Rowe, Daly, and Hernández López, changed that age for the male to 18 years and for the female to 16. But like the Spanish Civil Code, since its adoption, our Civil Code contained a clause for the *revalidation* or ratification, ipso facto and without an express declaration of the marriage contracted by persons under the age of puberty, "if after having attained the legal age of puberty they should have lived together for one day without having commenced judicial proceedings to have the marriage declared invalid [our Code added 'the representatives of either of them'] or if the woman should have ['shall have,' in ours] conceived before the legal age of puberty or before the institution of said suit."

This clause on revalidation or ratification ipso facto of marriages contracted by persons under the age of puberty, under the Spanish Civil Code, could only comprise cases of statutory rape pursuant to § 453 of the Spanish Penal Code of 1870 equal to § 453 of the Penal Code of 1879, edition for Cuba and Puerto Rico, which established as the offense of (statutory) rape, lying with a woman under 12 years of age. The proviso added to § 70 of our Civil Code by Act No. 12 of March 29, 1937, in the sense that "every woman over fourteen and under sixteen years of age who has been seduced may contract marriage with the previous consent of her parents or tutor, and if these refuse it, with the consent of the part of the Superior Court of the place where the seduced woman resides; and every man over sixteen and under eighteen years of age who is under an accusation of having seduced a woman over fourteen and under sixteen years of age, may also contract marriage with the previous consent of

his parents or tutor, and if these refuse it, with the consent of the part of the Superior Court of the place where the seduced woman resides; and such marriage shall be considered sufficient to bar all prosecution, in the same form as in the other cases referred to in section 262 of the Penal Code," does not invalidate the efficacy which the original clause of § 70 of the Civil Code has in itself on revalidation ipso facto of the marriages of males under 18 years of age and of females under 16 years of age.

The amendment made by the Act of 1937 to the aforementioned section of our Civil Code considers the cases where a female between fourteen and sixteen years of age is *seduced,* and the marriage is performed with the consent of her parents, or otherwise with the consent of the corresponding Part of the Superior Court, and it produces a valid marriage, irrespective of the age of the seduced female, provided she is over fourteen and under sixteen years of age. With this provision, the 1937 amendment provided the capacity which females over fourteen and under sixteen years of age lacked until then for a marriage which would be valid since its performance. However, it does not provide the capacity of a female over fourteen and under sixteen years of age to contract marriage if she has not been seduced. In that case, like in the case of a female under fourteen years of age, the provision on revalidation ipso facto of marriages contracted by females under the legal age of puberty is applicable if, upon attaining the age of sixteen years—age fixed by our Civil Code as the legal age of puberty—"the parties shall have lived together without the representatives of either of them having brought suit against its validity, or if the woman shall have conceived before the legal age of puberty, or before having established such suit." The fact that our Penal Code in its § 255 establishes as the offense of rape the act of having sexual intercourse with a female not the wife of the perpetrator if she is under the age of fourteen years (offense of

statutory rape) does not repeal the applicability of the clause on revalidation ipso facto of marriages contracted by females under sixteen years of age contained in § 70 of our Civil Code, insofar as that marriage has been contracted by a female under the age of fourteen years established by the Penal Code as the basis for the offense of statutory rape. It was so in Spain, as I have indicated before.

As to the marriage performed on June 25, 1964, where the female had been born on May 24, 1951, the evidence not controverted at the hearing before this Court was that they lived happily and had a son and had had another who had died. This fact leads to the inevitable conclusion that that marriage, by reason of the conception, pursuant to § 70 of our Civil Code, was revalidated ipso facto.

With respect to the marriage performed on March 30, 1964, where the female had been born on June 15, 1950, the testimony of a sergeant of the detective tended to show that the former led a dissipated life and a complaint was filed against her and that she was entered in the Hogar de Niñas. Although, however, the minor's conduct was not in issue, it was not said whether the complaint had been filed against her before she became sixteen years old (fact which happened on June 15, 1966), nor was there evidence to the effect that aside from her internment—on which the time of its duration was not established—the contracting parties did not live together nor that her parents had brought suit against the validity of said marriage before she attained the legal age of puberty. Without being in condition to affirm that this marriage was revalidated ipso facto, pursuant to § 70 of our Civil Code, neither would I be in condition to affirm that it was not.

Considering the social purpose which led the judge to perform these marriages, notwithstanding the lack of legal capacity of the contracting females, pursuant to our Civil Code and the fact that their parents gave the express consent,

I do not think that this charge should be cumulative basis for the determination of the Court removing respondent.

As to the third charge, all that remained in the record was the wrong order entered by respondent, but no consequence of fact was proved that it affected, as it was alleged in the complaint, the constitutional right of any accused to remain out on bail before a judgment of conviction is rendered.

As to the remaining charges which refer to the personal conduct of the judge in public places, the residue of evidence which remains after disregarding that which in my opinion was discredited by the interest, animosity, persecution, and intimidation of concerted conspiratorial action which serves as the background for the complaint, would justify, together with what might remain of the other charges, a censure to respondent and admonition as to her responsibility as judge to protect the image she represents before the community.

Experience indicates that slander is a poor habit, of negative human value and of inferior social value which might often reach persons of proved integrity against whom it is sought to spread, on account of the people's fantasy many times, and others because of wickedness, figments of the imagination as if they were facts, and falsities as if they were true.

For the reasons stated and under the attendant circumstances of this case, I do not agree with the removal decreed.